# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

Case No. 00-206-CIV-MOORE

ELIAN GONZALEZ, a minor, by and
through LAZARO GONZALEZ, as
next friend, or, alternatively, as
temporary legal custodian,

      Plaintiff,

vs.

**ORDER**

JANET RENO, Attorney General of the
United States; DORIS MEISSNER,
Commissioner, United States Immigration
and Naturalization Service; ROBERT
WALLIS, District Director, United States
Immigration and Naturalization Service;
UNITED STATES IMMIGRATION AND
NATURALIZATION SERVICE; and
UNITED STATES DEPARTMENT OF
JUSTICE,

      Defendants.

_____/



FILED by _____ D.C.

**MAR 2 1 2000**

CLARENCE MADDOX
CLFR. U.S. DIST. CT.
S.D. OF FLA. - MIAMI

THIS CAUSE came before the Court upon Defendants' Motion To Dismiss or

Alternative Motion for Summary Judgment (DE # 22, filed January 26, 2000).[1]

UPON CONSIDERATION of the Motion and the pertinent portions of the record, and

after a hearing on March 9, 2000, at which the parties presented oral argument, the Court enters

this Order, which is outlined below as follows.

_____

[1]This case was originally randomly assigned by computer to Senior United States District
Judge James L. King. Following Senior Judge King's recusal, the case was randomly reassigned
by computer to Senior United States District Judge William M. Hoeveler. When Senior Judge
Hoeveler became seriously ill and required hospitalization, the case was randomly reassigned to
the undersigned.

The Order is presented in four parts. In Part I of the Order, the Court sets forth the factual background leading to the filing of the Complaint in this case. Part II concerns this Court's subject matter jurisdiction over Defendants' claims, as well as the related issues of Plaintiff's standing to bring suit, real party in interest, capacity, and next friend status. In Part III, the Court addresses the merits of each count set forth in the Complaint. Part IV provides a conclusion.

## I. BACKGROUND

The facts of this case are presented here in summary fashion. On November 25, 1999, the United States Coast Guard intercepted two fishermen who had rescued five-year-old Elian Gonzalez ("Plaintiff")[2] from the Atlantic Ocean off the southeastern coast of Florida. The Coast Guard transported the boy, whose mother perished during the voyage from Cuba to the United States, to a local hospital. Later that day, the United States Immigration and Naturalization Service ("INS") granted Plaintiff a temporary deferral of his inspection and placed him in the care of his paternal great uncle, Lazaro Gonzalez, who resides in Miami, Florida.

On November 27, 1999, Plaintiff's father, Juan Gonzalez,[3] sent a letter to the Cuban government requesting that his son be returned to him in Cuba. The letter stated that Plaintiff, who was born and had been raised in Cuba, "was taken out of [Cuba] in an illegal manner and

---

[2]Although the Complaint was filed in the name of Elian Gonzalez, "a minor, by and through Lazaro Gonzalez, as next friend, or, alternatively, as temporary legal custodian," the submissions on Elian's behalf refer to "Plaintiffs," and Defendants note that there are "two plaintiffs." Clearly, in an action filed "in the name of" a minor, and without the assertion of an independent claim by the "next friend," there is only one plaintiff.

[3]The parties employ various names for Plaintiff's father: Juan Gonzalez, Juan Gonzalez-Quintana, Juan Manuel Gonzalez-Quintana, Juan Miguel Gonzales-Quintana and Juan Miguel Gonzalez-Quintana. For consistency, the Court refers to him as Juan Gonzalez.

without [Juan Gonzalez's] consent." Letter from Juan Gonzalez to Felipe Perez Roque, Minister of Foreign Relations of 11/27/99, Defendants' Notice of Filing Record and Exhibits, at 110 (English translation). The request was forwarded to the United States interests section in Havana that same day, and then to the INS. In a letter to Juan Gonzalez dated December 8, 1999, Robert Wallis, INS District Director, outlined the documentation required by the INS in order to release Plaintiff to his father's custody.

Two days later, an application for asylum for Plaintiff was submitted to the INS, signed by Lazaro Gonzalez. The alleged grounds for asylum were membership in a particular social group and/or political opinion.[4] Shortly thereafter, another application—identical to the first—was submitted with Plaintiff's own printed name. On January 10, 2000, a Florida state court granted Lazaro Gonzalez "limited legal authority . . . to assert and protect such rights as the child may have under United States immigration law."[5] Lazaro Gonzalez then filed another asylum application on Plaintiff's behalf.

_____

[4]There are only five permitted grounds for the granting of asylum: race, religion, nationality, membership in a particular group, and political opinion. See 8 U.S.C. § 1158(b)(1) ("The Attorney General may grant asylum to an alien . . . if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title."). 8 U.S.C. § 1101(a)(42)(A) provides, in pertinent part, that the term "refugee" means "any person . . . who is unable or unwilling to return to . . . [his home country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." This provision conforms to international guidelines. See INS v. Cardoza-Fonseca, 480 U.S. 421, 436 (1987) ("[O]ne of Congress' primary purposes was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees.").

[5]See Temporary Protective Order, Gonzalez v. Gonzalez-Quintana, 00-00479 FC 29 (Fla. Cir. Ct. Jan. 10, 2000) (granting "Petitioner's Verified Emergency Ex-Parte Petition for Interim Order").

3

In the interim, an INS official conducted two interviews with Juan Gonzalez in Havana and obtained documentation of his request that Plaintiff be returned home to Cuba. During the first of those interviews, on December 13, 1999, Juan Gonzalez read from a handwritten statement and asked that any application for admission to the United States on his son's behalf be withdrawn. Silma L. Dimmel, Officer-in-Charge for the INS in Havana, conducted the interview in Spanish at Juan Gonzalez's home. Report of Interview with Juan Gonzalez, Defendants' Notice of Filing Record and Exhibits, at 48. When asked for his preference regarding Plaintiff, Juan Gonzalez stated the following:

> Elian, at the age of six, cannot make a decision on his own. . . . I'm very grateful that he received immediate medical assistance, but he should be returned to me and my family. As for him to get asylum, I am not allowing him to stay or claim any type of petition; he should be returned immediately to me.

Id. at 50.

During the interview, Juan Gonzalez also stated that Plaintiff "practically lived with me since he attended school closer to my residence [than to the residence of Plaintiff's mother]," and Plaintiff's paternal grandmother had cared for the boy while the parents worked. Juan Gonzalez asserted that he had been unaware that Plaintiff's mother was taking Plaintiff to the United States. He also stated that he wanted no claim or petition raised on Plaintiff's behalf, that Plaintiff's paternal relatives living in Miami have "no rights over Elian," and that he did "not want any law firm to represent Elian." Juan Gonzalez also expressed concern that Lazaro Gonzalez is "under pressure" and "unable to back off because of the circumstances of what could happen." Id. at 49-54.

In order to address concerns that the oral discussion might be monitored by external

4

sources, the INS official provided Juan Gonzalez with a short written list of questions and possible answers for him to complete. His answers indicated that he felt he could "speak freely" and that it was his desire that Plaintiff "should return to Cuba." Id. at 57.

On December 20, 1999, officials from an INS District Office met with Lazaro Gonzalez, his daughter who resides in his home, and several attorneys. One of the INS officials present, Jorge L. Roig, Port Director for the INS at the Port of Miami, spoke directly with Lazaro Gonzalez and prepared a report of the interview (which was not recorded). According to Lazaro Gonzalez, Juan Gonzalez said that "if the boy made it to this country safe and sound that we should protect him by whatever means available." Declaration of Jorge L. Roig, Defendants' Notice of Filing Record and Exhibits, at 221. He also asserted that Juan Gonzalez is "under pressure" from the Cuban government, and that "whoever knows about the Castro system, knows this is how it works there." Id. When asked about any specific or objective reason to believe that Plaintiff would be harmed if he returned to Cuba, Lazaro Gonzalez stated that "everything he has, if he goes back, it's all changed," and that Plaintiff's "activities here are different from those that he would have over there." Id. at 222.

Subsequent to the meeting, attorney Roger Bernstein sent a letter to the General Counsel of the INS, claiming that in light of the "endemic and gross violations of human rights which exist in Cuba," Juan Gonzalez is not able to express his true wishes regarding Plaintiff "without dire repercussions to his person and family." Letter from Roger Bernstein to Owen Cooper, General Counsel, INS of 12/27/99, Defendants' Notice of Filing Record and Exhibits, at 225-26. Mr. Bernstein offered to provide written affidavits to support his assertions that Juan Gonzalez's movements are restricted, that his "tone drastically changed" in conversations with Lazaro

5

Gonzalez, and that the Cuban government had "harassed" Plaintiff's mother. Id.

On December 31, 1999, the INS official in Havana again met with Juan Gonzalez—this time to "clarify some of the answers provided" during the first interview. Declaration of Silma L. Dimmel, Defendants' Notice of Filing Record and Exhibits, at 229. During this meeting, which took place at the private residence of a United Nations official, Juan Gonzalez completed another written questionnaire, indicating that his actions were not restricted and that he did not want Plaintiff to stay in the United States. Id. at 231 (English translation). He expressed offense that the INS was "questioning my paternity over others that have no rights. . . . [and] giving more rights to others . . . although they have no authority over Elian." Id. at 241.

The General Counsel for the INS prepared a Memorandum, dated January 3, 2000, which cited pertinent cases from the United States, as well as provisions of Cuban law, and expressly considered the following question: "May Plaintiff apply for asylum in direct opposition to the expressed wishes of his father?" Memorandum from Bo Cooper, General Counsel for Doris Meissner, Commissioner of 1/3/00, Defendants' Notice of Filing Record and Exhibits, at 7-17. The Memorandum addressed Florida law on the competency of a minor to enter into a contract and noted that the INS "generally assumes that someone under the age of 14 will not make representation or other immigration decisions without the assistance of a parent or legal guardian." Id.

In light of the attorneys' concerns regarding the voluntariness of Juan Gonzalez's statements, and a "general understanding of the practices of the Castro regime," the General Counsel found it "essential that the INS closely examine the voluntariness of the father's statements." Id. The General Counsel concluded that "the father is able to represent adequately

6

the child's immigration interests," and that if Juan Gonzalez were to come to the United States, the INS "would be required to recognize Elian's father's interests . . . [and] would necessarily change the custody arrangement we sought with his uncle in his absence." Id. The Memorandum also noted that while there are no age-based restrictions on applying for asylum, the INS need not process applications "if they reflect that the purported applicants are so young that they necessarily lack the capacity to understand what they are applying for or, failing that, that the applications do not present an objective basis for ignoring the parents' wishes." Id. The General Counsel concluded that Plaintiff "lacks the capacity to raise an asylum claim." Id.

The INS sent a letter to Roger Bernstein and Spencer Eig, two attorneys purporting to represent Plaintiff, reporting the decision of the Commissioner:

> After carefully considering all relevant factors, we have determined that there is no conflict of interest between Mr. Gonzalez-Quintana and his son, or any other reason, that would warrant our declining to recognize the authority of this father to speak on behalf of his son in immigration matters.
>
> . . .
>
> You and your associates have submitted several Forms G-28, Notice of Entry and Appearance as Attorney, for Elian. . . . After careful consideration, we have determined that we cannot recognize any of the Forms G-28 as authorizing you to represent Elian in immigration matters. Although the INS has placed Elian in the physical care of Lazaro Gonzalez, such placement does not confer upon Lazaro Gonzalez the authority to act on behalf of Elian in immigration matters or authorize representation in direct opposition to the express wishes of the child's custodial parent. Further, we do not believe that Elian Gonzalez, who recently turned six years old, has the legal capacity on his own to authorize you to represent him. Finally, Mr. Gonzalez-Quintana has expressly declined to authorize you or your firms to represent Elian. Therefore, the INS cannot recognize you as Elian's representatives.

7

. . .

> [W]e have determined that Elian does not have the capacity to apply
> for asylum without the assistance of his parent. Further, neither the
> applications you have submitted nor any other information available
> indicates that Elian would be at risk of harm in Cuba such that his
> interests might so diverge from those of his father that his father
> could not adequately represent him in this matter. Therefore, given
> Mr. Gonzalez-Quintana's decision not to assert Elian's right to
> apply for asylum, we cannot accept the asylum applications you
> have submitted on Elian's behalf.
>
> Mr. Gonzalez-Quintana has also repeatedly requested that
> Elian be returned immediately to his custody in Cuba. We consider
> this to be a request to withdraw Elian's application for admission to
> the United States, made by Elian's custodial parent with authority to
> speak for Elian in immigration matters. Therefore, we have granted
> Mr. Gonzalez-Quintana's request to withdraw Elian's application
> for admission to the United States.

Letter from Michael A. Pearson, Executive Associate Commissioner for Field Operations, to

Roger Bernstein and Spencer Eig of 1/5/00, Defendants' Notice of Filing Record and Exhibits, at

5-6.

On January 6, 2000, James J. Burzynski, Director of the INS's Texas Service Center, sent

a letter to Roger Bernstein, which indicated that the asylum applications that had been filed on

Plaintiff's behalf were being returned, pursuant to the reasons articulated in the January 5, 2000

letter from Michael Pearson. Attached to the letter were the actual applications that had been

filed, as well as a copy of the letter from Michael Pearson. Letter from James J. Burzynski,

Director, TSC, to Roger Bernstein of 1/6/00, Complaint Ex. A.

The attorneys who claimed to represent Plaintiff in his asylum applications sought

reconsideration of the Commissioner's decision to reject the applications, which had been

articulated in the letters from Michael Pearson and James Burzynski. On January 12, 2000,

Attorney General Janet Reno issued her decision upholding the INS's determination. Her letter is

reproduced here, in pertinent part:

> While I am always open to considering new information that might
> arise, I am not currently aware of any basis for reversing
> Commissioner Meissner's decision that Juan Gonzalez—Elian's
> father—has the sole authority to speak for his son on immigration
> matters.
>
> . . . .
>
> As a general matter, when dealing with a child this young, the
> immigration law, like other areas of law, looks to the wishes of the
> surviving parent. . . . Commissioner Meissner has determined that,
> under applicable law, Elian is too young to make legal decisions
> for himself, and that his father has the legal authority to speak for
> him in immigration matters.
>
> Commissioner Meissner reached her decision through a
> careful and thorough process. All of the available information was
> considered, including the reports from two lengthy and private
> interviews with Elian's father, Juan Gonzalez, and the report from
> the December 20 meeting with Elian's great uncle and cousin and
> each of you. Commissioner Meissner also carefully considered the
> allegation that Juan Gonzalez was under some form of coercion,
> and is confident, based on her representative's direct contact with
> Juan Gonzalez, the father's very close relationship with Elian, and
> the other evidence provided, that the father has expressed his true
> wishes in asking that his son be returned to him.
>
> The INS does not rule out the possibility of a case in which
> an asylum application would be accepted from a young child
> against the wishes of a parent. . . . The INS reviewed the asylum
> application you sought to file on Elian's behalf, considered all
> other relevant available information, and found no objective basis
> for overriding the father's wishes for his son. In particular, the INS
> found no credible information indicating that the child would be at
> risk of torture or persecution if returned to his father, and thus
> concluded that it had no reason to question the father's decision not
> to assert an asylum claim.
>
> . . . .

9

> Nothing in the field guidance [referring to citations from the INS Inspector's Field Manual] suggests that a father's wishes regarding his six-year-old child should be overridden. On the contrary, in a related provision you do not cite, the Field Manual makes it clear that the first responsibility of the INS when confronted with an unaccompanied minor is to attempt to remedy the situation by finding the child's parent or legal guardian, even if that person is outside the United States. . . .

> If Elian is not competent to "indicate[ ] a fear of persecution or intention to apply for asylum," then someone would have to decide in his behalf whether to do so. That someone, under universally accepted legal norms, is his father. And his father has stated, in no uncertain terms, that he does not wish for Elian to make an asylum claim. As noted above, the INS considered relevant information, including the statements of Elian's Miami relatives and information in the asylum application, and determined that there is no objective basis for a valid asylum claim. Consequently, it found no conflict between Elian and his father. Under these circumstances, the appropriate course of action was to honor the desires of the father regarding Elian's applications for admission and asylum. It is not appropriate to commence removal proceedings against this six-year-old boy.

Letter from Attorney General Janet Reno to Spencer Eig, Roger Bernstein, and Linda Osberg-Braun of 1/12/00, Defendants' Notice of Filing Record and Exhibits, at 25-28.

In a subsequent letter, the INS reaffirmed the agency's position with respect to the applications for asylum filed on behalf of Plaintiff, including the application filed on January 12, 2000:

> The new application, filed yesterday, is accompanied by a letter from you acknowledging that the information contained in this latest submission is the same as what you submitted last month. Thus, the only new factors in this case are Lazaro Gonzalez's signature on the new application and the Florida circuit judge's temporary protective order. The Commissioner has concluded that nothing in that order alters her determination that Juan Gonzalez has sole legal authority to speak for Elian on immigration matters, and that determination is ultimately one of

> federal immigration law. Thus, INS has determined that neither
> you nor Lazaro Gonzalez represents Elian before the INS.
> Accordingly, INS cannot accept the enclosed asylum application
> and I am returning it to you.

Letter from James Burzynski, Director, Texas Service, to Roger Bernstein of 1/13/00,

Defendants' Notice of Filing Record and Exhibits, at 317-18.

Finally, on January 19, 2000, Plaintiff filed this lawsuit, alleging that the INS lacked the

authority to reject the asylum applications and was required—by federal statutes and

regulations—to accept and adjudicate those applications. Defendants urge this Court to dismiss

the action or, alternatively, to grant summary judgment. Defendants attack the Complaint on

various grounds, each of which is addressed below. Having carefully studied this matter, and

mindful of the limits on this Court's authority, the Court concludes that Defendants' Motion To

Dismiss or Alternative Motion for Summary Judgment must be granted.


## II. JURISDICTION AND STANDING

### Summary of Part II

The discussion in Part II of this Order is set forth in summary form as follows. To begin,

the Court is satisfied that it has limited subject matter jurisdiction to consider the Complaint. The

Court further concludes that Plaintiff has standing to bring the Complaint, and is a real party in

interest for the purposes of the instant action. The Court does not find that Plaintiff has the

requisite capacity to sue in federal court; however, the Court holds that Lazaro Gonzalez is a

sufficient next friend exclusively for the purposes of bringing the instant action on Plaintiff's

behalf.

11

**Plaintiff's Status**

For immigration purposes, Plaintiff is an unaccompanied minor alien who "arrived" in the United States because he was "brought to the United States after having been interdicted in international or United States waters." 8 U.S.C. § 1225(a)(1). An alien who arrives in the United States is deemed to be an applicant for admission. See id. Plaintiff has not been placed in removal proceedings, but rather has been temporarily "paroled" into the United States, and the INS has deferred his inspection.[6] That deferral of processing for removal, originally issued on November 25, 1999, was extended until January 21, 2000, and reportedly has been extended indefinitely.[7]

Although three applications were filed seeking asylum for Plaintiff—all of which were filed outside of the context of removal proceedings, each was returned by the INS without adjudication. Therefore, Plaintiff, now six years old, is an unaccompanied, unadmitted alien,[8] subject to removal from the United States at the end of his period of temporary parole.

---

[6]The decision to grant parole in lieu of detention pending removal is a matter within the discretion of the INS. See 8 U.S.C. § 1182(d)(5); 8 C.F.R. § 235.2(e).

[7]Defendants' counsel stated at the March 9, 2000 hearing that the deferral has been extended indefinitely.

[8]In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, 3009-546 (1996) ("IIRIRA"), and in doing so, made sweeping changes to the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq. ("INA"), including the addition of new immigration terminology. For the purposes of this Order, the Court uses the term "unadmitted alien" as synonymous with "excludable alien," which shall refer to any alien who has reached the border of this country, but has not been admitted. See also Bertrand v. Sava, 684 F.2d 204, 205 n.1 (2d Cir. 1982).

## A.   Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction, deriving their authority from both constitutional and legislative sources. See U.S. Const. art. III, § II; 28 U.S.C. § 1331; Keene Corp. v. United States, 508 U.S. 200 (1993). It is exclusively the power of Congress to restrict the jurisdiction of federal courts to adjudicate certain kinds of cases. See Keene Corp., 508 U.S., at 207; see also United Gas Pipe Line Co. v. Whitman, 595 F.2d 323, 330 (5th Cir. 1979) (noting that only Congress may retract or expand the limits of federal judicial power).[9]

In addition, federal courts will not infer congressional intent to restrict their jurisdiction. See Block v. Community Nutrition Inst., 467 U.S. 340 (1984). The presumption in favor of judicial review may be rebutted only by a showing of "clear and convincing evidence" that Congress intended to preclude review. See Board of Governors of the Fed. Reserve Sys. v. McCorp. Fin., Inc., 502 U.S. 32, 44 (1991). This is not a strict evidentiary burden, but rather one that may be met where a "congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.'" Block, 467 U.S. at 351 (quoting Data Processing Serv. v. Camp, 397 U.S. 150, 156 (1970)). In the event that there is "substantial doubt" as to congressional intent, the presumption in favor of judicial review controls. See id.

In applying these jurisdictional tenets to the case at bar, the Court looks first to the statutes that form the basis of Plaintiff's Complaint. See 8 U.S.C. §§ 1103, 1158. These statutes grant the Attorney General broad authority both to implement this nation's immigration laws and to exercise her discretionary authority over the grant of asylum. What is not included within

---

[9]Decisions of the Fifth Circuit rendered on or before September 30, 1981 are binding on the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981).

either of the statutory provisions is a clear statement of congressional intent regarding judicial

review of the processing of asylum applications by the INS. However, regarding section 1158(a),

it is clear that the Attorney General's decision to permit an alien to apply for asylum relief itself

is subject to review. See 8 U.S.C. § 1252(b)(4)(D) (providing that the decision whether to "grant

relief under section 1158(a)" is "conclusive unless manifestly contrary to law and an abuse of

discretion").

      Plaintiff asserts that 28 U.S.C. § 1331, 28 U.S.C. § 1346, 28 U.S.C. § 1361, and 28

U.S.C. § 2201 provide this Court with subject matter jurisdiction over his claim that the INS

must accept and adjudicate his applications for asylum pursuant to applicable constitutional,

statutory, and regulatory provisions. Defendants assert that this Court lacks jurisdiction over the

challenged agency action because such action is firmly committed to administrative

discretion—similar to the agency's decision to commence removal proceedings. See 8 U.S.C. §

1252(g). Because the Attorney General's decision not to commence removal proceedings is

unreviewable under section 1252(g), Defendants suggest that this Court lacks subject matter

jurisdiction over this case.

      In support of their position that there is no basis for judicial review over the action at

issue, Defendants direct the Court's attention to Heckler v. Chaney, 470 U.S. 821 (1985), in

which the Supreme Court found that agency decisions not to institute enforcement proceedings

generally are not subject to judicial review under the Administrative Procedure Act ("APA"), 5

U.S.C. §§ 101 et seq. In so holding, the Court declared that "an agency's decision not to

prosecute or enforce, whether through civil or criminal process, is a decision generally

committed to an agency's absolute discretion." See id. at 831.

In contrast to Chaney, the INS decision in the instant case—affirmed by the Attorney General—involved not a matter of enforcement, but rather the refusal to accept an asylum application. Accordingly, the Court rejects Defendants' contention that Chaney is controlling in the instant context.

Defendants also rely on 8 U.S.C. § 1252(g), which bars judicial review of "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g).[10] Plaintiff correctly argues that § 1252(g) is simply inapplicable, as he is not seeking the initiation of removal proceedings, but rather seeks simply for the INS to accept and consider his affirmative application for asylum.

Indeed, the Supreme Court in Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471 (1999), declined to read the restriction on judicial review found in section 1252(g) as broadly as has been urged by the INS. In American-Arab, which involved allegations that the INS had unfairly targeted individuals for deportation proceedings, the Supreme Court concluded that judicial review was unavailable because the challenged action constituted one of the three discrete actions that was specified in 1252(g) (exempting from review decisions of the Attorney General to "'commence proceedings, adjudicate cases, or execute removal orders'"). The

---

[10]The Court infers from their argument that Defendants support an interpretation of this language that precludes not only decisions or actions to "commence proceedings, adjudicate cases, or execute removal orders," but decisions or actions *not* to do all of the above, as well. The Court finds this interpretation to be a proper one. See also Alvidres-Reyes v. Reno, 180 F.3d 199, 205 (7th Cir. 1999) ("[T]he Attorney General's executive discretion to decide or act to commence proceedings always has been considered inherently to include the ability to choose not to do so.").

Supreme Court resisted a reading of section 1252(g) that would extend the application of the

section, noting as follows:

> It is also implausible that the mention of three discrete events along
> the road to deportation was a shorthand way of referring to all
> claims arising from deportation proceedings. Not because
> Congress is too unpoetic to use synecdoche, but because that
> literary device is incompatible with the need for precision in
> legislative drafting. We are aware of no other instance in the
> United States Code in which language such as this has been used to
> impose a general jurisdictional limitation . . . .

Id. at 943. Based on the decision in American-Arab, this Court declines to read section 1252(g)

as broadly as Defendants desire.

Defendants further argue that this case involves not only an application for asylum but

also an application for admission to the United States, and that the INS decision to permit

withdrawal of an application for admission is not subject to review by this Court. Although, as an

arriving alien, Plaintiff is deemed to be an applicant for admission, see 8 U.S.C. § 1225(a)(1),

Plaintiff asserts that this issue is not dispositive because the application for asylum is filed under

a separate statutory provision, see 8 U.S.C. § 1158, with procedures independent of those related

to applications for admission.

As to the application for admission, which was deemed to have been filed by Plaintiff

through his mere presence as an arriving alien in this country, Defendants argue that 8 U.S.C. §

1252(a)(2)(B) bars review of any claim that the request to withdraw Plaintiff's application for

admission was improperly granted:

> Notwithstanding any other provision of law, no court shall
> have jurisdiction to review (ii) any other decision or action
> of the Attorney General the authority for which is specified
> under this subchapter to be in the discretion of the Attorney

16

General, other than the granting of [asylum] relief under
section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B)(ii). Specifically, Defendants point to 8 U.S.C. § 1225(a)(4), which

provides that with respect to the withdrawal of applications for admission, "[a]n alien applying

for admission may, in the discretion of the Attorney General and at any time, be permitted to

withdraw the application for admission and depart immediately from the United States." 8 U.S.C.

§ 1225(a)(4). Thus, Defendants argue, the discretionary decision to prevent withdrawal of an

application for admission may not be reviewed.

Plaintiff most strenuously urges that the INS decision not to accept the application for

asylum filed under 8 U.S.C. § 1158 is the basis for his Complaint—not any purported withdrawal

of the application for admission. And, as 8 U.S.C. § 1252(a)(2)(B)(ii) specifically exempts

certain decisions under 8 U.S.C. § 1158(a) from the general elimination of judicial review,

Plaintiff argues that this Court clearly has subject matter jurisdiction—or, at a minimum, the

Court's subject matter jurisdiction is not eliminated by 8 U.S.C. § 1252(a)(2)(B)(ii). While the

Defendants raise a compelling point regarding this Court's subject matter jurisdiction over an

INS decision permitting withdrawal of an application for admission, it is clear that INS decisions

regarding an application for asylum are governed by a different standard.[11]

---

[11]On another note, pursuant to 8 U.S.C. § 1158(d)(7), it appears that Congress did not
intend to create, under subsection (d), "any substantive or procedural right or benefit that is
legally enforceable." 8 U.S.C. § 1158(d)(7). However, the Court does not find that this language
precludes judicial review over claims under subsection (a). The Court recognizes that this creates
an apparent anomaly in Congress's decision to permit judicial review on the one hand, while
foreclosing private rights of action on the other hand, within the same section. But such
anomalies in the area of immigration law are by no means unusual.

As observed in a recent decision of the Eleventh Circuit, "this is immigration law where
the issues are seldom simple and the answers are far from clear." Alanis-Bustamante v. Reno,

17

It also would appear that the provision relating to 8 U.S.C. § 1158(a) within 8 U.S.C. § 1252(a)(2)(B)(ii) can be read to exclude only 8 U.S.C. § 1158(a)(1) ("Any alien . . . may apply for asylum") from the preclusion of judicial review, as decisions under 8 U.S.C. § 1158(a)(2) (excepting certain categories of aliens from the provisions of (a)(1)—for example, those who have previously unsuccessfully applied for asylum) expressly have been excluded from judicial review by 8 U.S.C. § 1158(a)(3). See 8 U.S.C. § 1158(a)(3) ("No court shall have jurisdiction to review any determination by the Attorney General under paragraph (2)."). Thus, clearly the only remaining portion of section 1158(a) that could be subject to judicial review by this Court is subsection (a)(1). The Court further observes that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion." Russello v. United States, 464 U.S. 16, 23 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972) (per curiam)).[12]

Because of the parties' dispute regarding legislative intent and the absence of compelling evidence before the Court as to judicial review of the action challenged in this case, the Court

---

201 F.3d 1303 (11th Cir. 2000). Notably, this view of immigration law is hardly a recent phenomenon. See Kwon v. INS, 646 F.2d 909, 919 (5th Cir. May 1981) ("Whatever guidance the regulations furnish to those cognoscenti familiar with INS procedures, this court, despite many years of legal experience, finds that they yield up meaning only grudgingly and that morsels of comprehension must be pried from mollusks of jargon.").

[12]Similarly, in 8 U.S.C. § 1158(b)(2)(D), Congress expressly excludes from review determinations of the Attorney General under section 1158(b)(2)(A)(v) (exempting terrorists from the class of persons to whom asylum may be granted). As noted above, this "disparate inclusion" by Congress suggests that there is no ban on judicial review as to other portions of section 1158(b).

conducted an inquiry into the relevant legislative history. This review, which included a study of the significant changes in immigration law enacted in 1996,[13] does not compel a finding that the Court is without jurisdiction over this matter.

Upon review of the pertinent statutes, the applicable legislative history, and controlling case law, the Court finds that there is "substantial doubt" that Congress intended to establish a jurisdictional barrier to judicial review of the administrative decision at issue in the instant case, and the Court declines to strain in order to find any such intent. Accordingly, the Court concludes that Defendants' Motion must be denied as to subject matter jurisdiction.[14]

## B.    Proper Plaintiff

### 1.    Introduction

Having established its limited subject matter jurisdiction in the instant case, the Court

---

[13]See Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, 3009-546 (1996) ("IIRIRA"); Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 (1996) ("AEDPA").

[14]As an aside, the Court observes that there exists no final agency order in this case, or other decision of the type envisioned by 8 U.S.C. § 1252(a)(2)(B), which provides:
> Notwithstanding any other provision of law, no court shall have jurisdiction to review—
> (i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229(b), 1229(c), or 1255 of this title, or
> (ii) any other decision or action of the Attorney General the authority for which is specified under this subchapter to be in the discretion of the Attorney General, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B). The existence of such an order would trigger review by the Eleventh Circuit and consequently preclude this Court's jurisdiction over the instant case. See 8 U.S.C. § 1252(b)(2) ("The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings.").

19

now turns to the question of whether Plaintiff may bring this suit "by and through Lazaro

Gonzalez as next friend, or alternatively as temporary legal custodian of Elian Gonzalez." See

caption to Plaintiff's Complaint. Resolution of this issue first requires that Plaintiff has standing

under Article III. Once it is determined that Plaintiff has standing, the Court must then evaluate

Lazaro's status as next friend, or alternatively as temporary legal custodian. For the reasons

discussed below, the Court concludes that Plaintiff has standing, that Lazaro is an appropriate

next friend,[15] and that this matter should proceed to a disposition of Defendants' Motion.

At the outset, the Court must dispose of a weakness in Defendants' position on the issue

of the proper plaintiff in this case. Defendants have cast their argument as an answer to the

following question: Who speaks for Plaintiff in agency immigration proceedings? It is clear,

however, that the issue of capacity to initiate proceedings before an administrative agency is

distinct from standing and related concepts in the context of a claim brought in federal court.

Defendants urge the Court to recognize these two separate concepts as indistinguishable, and this

represents a fundamental flaw in the premise of their argument on standing and capacity to sue in

federal court.

### 2.    Plaintiff's Article III Standing

The federal judiciary's power to hear cases is constitutionally confined to "cases" and

"controversies," U.S. Const. art. III, § 2, which impose certain limits on the federal courts. As the

Eleventh Circuit has held, "One of the most important of these constitutionally-based limits is

---

[15]Because the Court holds that Lazaro is a proper next friend, it does not reach the argument that Plaintiff brings this suit by Lazaro as temporary legal custodian. Note the Florida State Court Family Division's findings and conclusions that Lazaro Gonzalez is Plaintiff's temporary legal custodian. See Temporary Protective Order, Gonzalez v. Gonzalez-Quintana, 00-00479 FC 29 (Fla. Cir. Ct. Jan. 10, 2000).

the requirement that a litigant have 'standing' to invoke the power of a federal court." <u>Malowney</u> <u>v. Federal Collection Deposit Group</u>, 193 F.3d 1342, 1346 (11th Cir. 1999). Article III's standing requirement is intended, *inter alia*, to preserve the separation of powers, conserve judicial resources, improve judicial decisionmaking, and foster fairness for those who do not want their rights litigated by someone other than themselves. <u>See</u> Erwin Chemerinsky, Federal Jurisdiction 57-59 (3d ed. 1999).

A plaintiff asserts Article III standing to sue in federal court by alleging an "irreducible constitutional minimum" of three elements: (1) an "'injury in fact'"—in other words, "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical,"'"; (2) a causal connection between plaintiff's alleged injury and defendant's alleged behavior; and (3) a likelihood that the alleged injury will be redressed by a decision in plaintiff's favor. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992) (quoting <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 155 (1990)) (citations omitted).

A plaintiff's age is not determinative of standing;[16] children possess certain personal rights that are enforceable in federal court. <u>See</u> <u>Travelers Indemnity Co. v. Bengtson</u>, 231 F.2d 263, 265 (5th Cir. 1956). This is not to say, however, that children necessarily have the *capacity* to sue on their own behalf. <u>See</u> Fed. R. Civ. P. 17(b). Rule 17(c) of the Federal Rules of Civil Procedure provides mechanisms by which a child who has standing, but who is too young to

---

[16]This principle is evident in the immigration context. For example, in <u>Reno v. Flores</u>, 507 U.S. 292 (1993), the Supreme Court did not explicitly address the standing of "a class of alien *juveniles* . . . ." <u>Id.</u> at 294 (emphasis added). Nevertheless, the Court must have been satisfied that the juveniles had standing, as it proceeded to evaluate their facial challenge to INS regulations, as well as due process claims related to the custody of juvenile aliens pending deportation.

have capacity to sue, can bring suit through a representative. In this case, the six-year-old
Plaintiff alleges that he wants the INS to process applications seeking political asylum for him in
the United States despite his father's protestations. To that end, Plaintiff brings this suit by and
through a purported next friend, pursuant to Rule 17(c). To be clear, Plaintiff's standing is a
distinct inquiry from that of Lazaro Gonzalez's capacity to act as Plaintiff's next friend.[17]

Plaintiff alleges that Defendants did not evaluate his applications for asylum under the
required INS procedures—in violation of his constitutional, as well as statutory and regulatory
rights to due process. In Count I, Plaintiff asserts a constitutional right to due process. In Counts
II-IV, he claims statutory and regulatory rights to due process. Thus, Plaintiff's alleged injury in
fact relates not to the ultimate denial of asylum, but rather to the procedures employed by
Defendants in failing to reach the question of whether Plaintiff's requests for asylum should be
granted or denied.

Defendants argue that Plaintiff has no injury in fact because the INS determined that the
ability to submit and have adjudicated an application for asylum belongs to Plaintiff's father
alone. Because the father withdrew Plaintiff's application, Defendants reason that no asylum
application exists upon which Plaintiff can premise his claim of due process violations.

After a thorough analysis of the arguments and the pleadings, the Court concludes that
Plaintiff has asserted an injury in fact. However, the Court's analysis does not end here. As the

---

[17]Although the propriety of a next friend's representation may be referred to as that next
friend's "standing," see, e.g., Ford v. Haley, 195 F.3d 603, 624 (11th Cir. 1999); Lonchar v.
Zant, 978 F.2d 637, 640, 641 (11th Cir. 1992), for the sake of clarity, this portion of the Order
will refer only to the Plaintiff in terms of "standing"—as opposed to the next friend's "ability" or
"capacity" to represent Plaintiff in federal court litigation. See also Glickstein v. Sun
Bank/Miami, N.A., 922 F.2d 666, 670 (11th Cir. 1991) ("[T]he doctrine of [a representative's]
capacity is often incorrectly considered under the rubric of a standing claim.").

Supreme Court has clearly announced, when a suit challenges

> the legality of government action or inaction, the nature and extent
> of facts . . . [necessary] to establish standing depends considerably
> upon whether the plaintiff is himself an object of the action (or
> forgone action at issue). If he is, there is ordinarily little question
> that the action or inaction has caused him injury, and that a
> judgment preventing or requiring the action will redress it.

Lujan, 504 U.S. at 561-62. The named Defendants are governmental actors whose "action or

inaction" regarding Plaintiff's alleged claim for asylum forms the core of the instant case. Most

certainly, Plaintiff himself was the "object" of that alleged governmental in/action, in that the

INS's behavior pertaining to Plaintiff's asylum affects Plaintiff's very own asylum status. This

conclusion virtually requires a finding of standing, because it creates the supposition of a causal

connection between Plaintiff's claim and the government's in/action, as well as the assumption

that this Court has the power to redress the alleged deprivation. See id.

    By contrast, Defendants argue against a finding of standing on the grounds that the INS

determination that Juan Gonzalez alone speaks for Plaintiff in immigration matters forecloses

Plaintiff's ability to suffer any injuries related to the INS's decision. But it is precisely the

propriety of the INS's determination on Plaintiff's asylum claim that Plaintiff challenges in the

instant case before this Court.

    Defendants' argument against standing is a paradigmatic catch-22, which is insupportable

for two reasons. First, the federal courts are charged with determining a plaintiff's standing to

sue in federal court. In other words, the substantive agency decision that is at the heart of this

federal case cannot, in and of itself, resolve the Court's independent duty to answer the question

of whether Plaintiff has suffered an injury in fact. Second, Defendants' argument improperly

treats as interchangeable the merits of the underlying INS determination and the challenge to that

decision in this Court. To close the courthouse doors to a plaintiff seeking to bring a federal

challenge to the very governmental decision invoked to keep him out of federal court violates

common sense and this Court's duty to do justice, and is tantamount to an argument that this

Court should abdicate its independent duty to determine standing.

Satisfied that Plaintiff makes a colorable showing of an injury in fact, the Court reaches

the second and third prongs of the standing test. The causal connection between the alleged

deprivation of Plaintiff's due process and Defendants' in/action in processing his asylum

applications is abundantly clear: But for Defendants' alleged violation of their own procedures

for processing asylum applications, Plaintiff could not claim injury to his alleged right that the

procedures be followed. Moreover, the writ of mandamus that Plaintiff seeks in Count V could

be used to redress Plaintiff's alleged deprivation—should Plaintiff demonstrate the requisite

elements for issuance of this remedy. See In re Loudermilch, 158 F.3d 1143 (11th Cir. 1998)

(granting writ of mandamus), reh'g en banc denied, 168 F.3d 508 (11th Cir. 1999). Accordingly,

the Court finds that Plaintiff has satisfied the three-prong test for standing to sue Defendants in

this action.

### 3.    Real Party In Interest—Fed. R. Civ. P. 17(a)

The concepts of a plaintiff's standing to sue and his status as the real party in interest are

interrelated, yet conceptually distinct. As discussed earlier, standing is a constitutional

requirement that asks "'whether the litigant is entitled to have the court decide the merits of the

dispute or of particular issues.'" Allen v. Wright, 468 U.S. 737, 750-51 (quoting Warth v. Seldin,

422 U.S. 490, 498 (1975)). A "real party in interest" is the party in whose name a federal civil

action "shall be prosecuted . . . ." Fed. R. Civ. P. 17(a). Furthermore, a real party in interest must

be "the party who, by the substantive law, has the right sought to be enforced," Lubbock Feed

Lots, Inc. v. Iowa Beef Processors, Inc., 630 F.2d 250, 257 (5th Cir. 1980), and who "possesses a

significant interest in the action to entitle him to be heard on the merits." 6A C. Wright, A. Miller

& M. Kane, Federal Practice and Procedure § 1542, at 58 (supp. 1999).[18]

One line of cases acknowledges the similarity between the standing and real party in

interest inquiries, and advances the idea that "once a party is found to have standing to raise a

constitutional point, that ruling disposes of any real party in interest objections as well." Apter v.

Richardson, 510 F.2d 351, 353 (7th Cir. 1975); see also Swanson v. Bixler, 750 F.2d 810, 814

(10th Cir. 1984) (noting that a party without standing cannot be a real party in interest).

However, another line of reasoning requires a named plaintiff to demonstrate that he is a real

party in interest—regardless of the fact that he has satisfied the Article III constitutional

requirements for standing. See 4 Moore's Federal Practice, § 17.10[1] (Matthew Bender 3d ed.)

(stating that not every party with standing is a real party in interest, although real parties in

interest usually have standing). Adopting the more rigorous requirement, the Court finds that

Plaintiff not only has standing, but is a real party in interest.

The long-standing American common law rule that "'the parent stands in court [on his

---

[18]In this way, the real party in interest examination is similar to the Article III standing question. The notable distinctions are somewhat academic, but include the following: (1) standing requires a glance at the merits in order to establish injury in fact; but cf. Lenhard v. Wolff, 443 U.S. 1306, 1310 (1979) (asserting that standing does not involve the merits of the case in any fashion); (2) standing cannot be waived; and (3) a court may challenge a plaintiff's standing sua sponte. See 6A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1542, at 330-33 (2d ed. 1990).

child's behalf] as the real party in interest upon his natural right of parent,'" Lehman v.

Lycoming County Children's Servs. Agency, 458 U.S. 502, 524 (1982) (Blackmun, J.,

dissenting) (quoting Learned Hand, Habeas Corpus Proceedings for the Release of Infants, 56

Cent. L.J. 385, 389 (1903)), is not without exception. Indeed, concerns for a child's well-being in

light of his parents' "'own wrongdoing or unfitness'" militate against the rule. See id.

Furthermore, American jurisprudence has long held that minor children may be real parties in

interest when they possess rights reserved to them. See Martin v. Barbour, 140 U.S. 634, 647

(1891). A real party in interest need not even have the ability to "realize that [his] fate is involved

in these proceedings." Gardner v. Alabama, 385 F.2d 804, 806 (5th Cir. 1967), cert. denied, 389

U.S. 1046 (1968) (conferring real party in interest status upon, among others, "innocent babies

and children who are too immature" to realize that suit was brought on their behalf).

At the outset, the Court observes that the instant case was brought in Plaintiff's name.

Moreover, the Court finds that Plaintiff, despite his tender age, possesses a "significant interest"

in requiring the INS to follow its own procedures once asylum applications have been presented

to the INS. This conclusion is based on the fact that a decision on one's asylum claim likely has

enduring consequences.[19] Thus, the Court finds that Plaintiff is a real party in interest for the

narrow purpose of proceeding with this lawsuit to determine whether or not Defendants violated

---

[19]The Court rejects Defendants' claim that the INS's determination that Plaintiff's father retains the sole authority to decide whether Plaintiff may apply for asylum guides the analysis of the Rule 17(a) determination. The Court also observes that because Plaintiff's father is not a party to this litigation, and has filed no motion to intervene, the Court is not confronted with the question of whether Juan Gonzalez, too, could be a real party in interest in this case. See generally Fed. R. Civ. P. 19 (providing rules regarding joinder of parties).

Plaintiff's rights to procedural due process.

### 4.      Capacity To Sue—Fed. R. Civ. P. 17(b)

The fact that Plaintiff has standing and is a real party in interest begs the next question: Does Plaintiff possess the requisite capacity to sue? The phrase "capacity to sue" refers to "'a party's personal right to litigate in a federal court.'" Glickstein v. Sun Bank/Miami, N.A., 922 F.2d 666, 670 (11th Cir. 1991) (quoting 6A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1542, at 327 (2d ed. 1990)). As distinct from the standing and real party in interest analyses, capacity doctrine speaks to a party's "legal qualification, *such as legal age*, that determines one's ability to sue or be sued . . . ." Black's Law Dictionary 199 (7th ed. 1999) (emphasis added). Rule 17(b) of the Federal Rules of Civil Procedure sets forth the road map to resolving this issue: "The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of the individual's domicile." Fed. R. Civ. P. 17(b).

In the context of establishing citizenship for diversity purposes under 28 U.S.C. § 1332, a "domicile" is defined as the place where a person takes up residence with the intention to remain in that place. See Mas v. Perry, 489 F.2d 1396, 1399 (5th Cir. 1974). The Eleventh Circuit has imported this concept of domicile into the immigration law context. See Melian v. INS, 987 F.2d 1521, 1524 (11th Cir. 1993).

The Court need not decide whether Plaintiff was and is a domiciliary of Cuba or Florida, for under the laws of either jurisdiction, Plaintiff lacks capacity to bring suit for the purposes of

Rule 17(b). Cuba's Family Code[20] clearly provides that children "are under the *patria potestas* of their parents," id. art. 82, which bestows upon parents the right and duty of "representing their children in every judicial action . . . in which they are involve[d] . . . ." Id. art. 85(5). More specifically, Cuban law explicitly provides that six-year-old children lack capacity to bring lawsuits. See id. arts. 29.1, 31(a). Therefore, because Plaintiff was six years old at the filing of this action, Cuban law considers Plaintiff without capacity to bring this lawsuit himself.

Similarly, in Florida, children do not have capacity to sue at age six. Under Florida law, a "minor" is any person under age eighteen. See Fla. Stat. Ann. § 1.01(13) (West 1999). As a general rule, minors are bound by a statutory "disability of nonage," see, e.g., Fla. Stat. Ann. § 743.07(1) (West 2000), which curtails certain rights. See 25 Fl. Jur. 2d Fam. L. § 254 (1992). One result of this disability is incapacity to sue. See, e.g., Kingsley v. Kingsley, 623 So. 2d 780 (Fla. 5th DCA 1993) (holding that a minor did not have capacity to sue for termination of his parents' parental rights). Thus, under the law of either Cuba or Florida—the only jurisdictions that Plaintiff would appear to claim as his domicile—Plaintiff does not have capacity to sue.

### 5.   Lazaro Gonzalez as Next Friend—Fed. R. Civ. P. 17(c)

Rule 17(c) of the Federal Rules of Civil Procedure anticipates this situation, providing several alternatives by which a plaintiff lacking capacity to sue under Rule 17(b) may initiate and pursue a federal civil suit. See Fed. R. Civ. P. 17(c). Rule 17(c) provides as follows:

> **Infants or Incompetent Persons.** Whenever an infant or incompetent person has a representative, such as a general guardian, committee,

---

[20]See Código de familia. Ley 1,289 of 14 Feb 1975 in *Gaceta oficial* 15 Feb 1975. Translated in *Family code*. [Havana], Ministry of Justice, 1975.

> conservator, or other like fiduciary, the representative may sue or
> defend on behalf of the infant or incompetent person. An infant or
> incompetent person who does not have a duly appointed
> representative may sue by a next friend or by a guardian ad litem. The
> court shall appoint a guardian ad litem for an infant or incompetent
> person not otherwise represented in an action or shall make such
> other order as it deems proper for the protection of the infant or
> incompetent person.

Fed. R. Civ. P. 17(c).

In the case at bar, Lazaro Gonzalez is the self-appointed "next friend," by and through

whom Plaintiff filed his Complaint, and Lazaro Gonzalez therefore has the burden to establish

the propriety of proceeding as Plaintiff's next friend in this action. See Ford v. Haley, 195 F.3d

603, 624 (11th Cir. 1999). The ability to function as a next friend is not "'granted automatically

to whomever seeks to pursue an action on behalf of another.'" Lonchar v. Zant, 978 F.2d 637,

640 (11th Cir. 1992) (quoting Whitmore v. Arkansas, 495 U.S. 149, 163 (1990)). Instead, a

would-be next friend, such as Lazaro Gonzalez, must satisfy specific criteria, which the Supreme

Court enunciated first in the area of habeas corpus law, see Whitmore, 495 U.S. 149, but which

have been extended more recently to general federal civil litigation, see T.W. v. Brophy, 954 F.

Supp. 1306, 1309 (E.D. Wis. 1996).

In the Eleventh Circuit, a next friend: (1) must "prove that the real party in interest cannot

pursue his own cause due to some disability . . . and (2) must show some relationship or other

evidence that demonstrates the next friend is truly dedicated to the interests of the real party in

interest." Ford v. Haley, 195 F.3d at 624. The Court's Rule 17(b) analysis above illustrates the

satisfaction of the first prong of the next friend test. Lazaro Gonzalez's satisfaction of the second

requirement, however, requires additional consideration.

Typically, the next friend who sues on behalf of a minor is that minor's parent. <u>See</u>

Nancy J. Moore, <u>Conflicts of Interests in the Representation of Children</u>, 64 Fordham L. Rev.

1819, 1855 (1996). Furthermore, when a parent brings an action on behalf of a child, and it is

evident that the interests of each are the same, no need exists for someone other than the parent to

represent the child's interests under Rule 17(c). <u>See Croce v. Bromley Corp.</u>, 623 F.2d 1084,

1093 (5th Cir. 1980) (ruling that the district court did not commit reversible error by failing to

appoint a guardian ad litem for a child whose mother/legal guardian brought an action on the

child's behalf).

The participation of a non-parent next friend should give the Court some pause, but may

be appropriate in certain circumstances. Chief Justice Marshall recognized the existence of such

circumstances, and provided the following brief commentary that is as applicable to the instant

case as it was to litigation during his time:

> It is not error, but it is calculated to awaken attention that, in this
> case, though the infants, as the record shows, had parents living;
> a person not appearing from his name, or shown on the record to
> be connected with them, was appointed their guardian ad litem.[21]

<u>Bank of the United States v. Ritchie</u>, 33 U.S. 128, 144 (1834).

In the instant case, the father did not participate in filing the action. Quite to the contrary,

it appears that the interests of Juan Gonzalez and those asserted in the Complaint are sharply at

---

[21]Rule 17(c) equates a next friend with a guardian ad litem in terms of their respective
duties to represent the interests of an infant or incompetent person. <u>See also</u> 4 Moore's Federal
Practice, § 17.10[3][c] (Matthew Bender 3d ed.) (noting that next friends and guardians ad litem
are both nominal representatives—as compared to general guardians, who have more vested
interests).

odds with one another. The question for the Court is whether Lazaro Gonzalez is "truly dedicated" to Plaintiff's interests.[22]

In <u>Developmental Disabilities Advocacy Ctr., Inc. v. Melton</u>, 689 F.2d 281, 285 (1st Cir. 1982), the First Circuit recognized that even when a plaintiff has a duly appointed guardian and Rule 17(c) "would appear to preclude suit by a next friend," Rule 17(c) actually mandates that the Court utilize its discretion to override the duly appointed guardian's position if necessary "for the protection of the infant or incompetent person." <u>See id.</u>; Fed. R. Civ. P. 17(c). This idea was supported in <u>Chrissy F. v. Mississippi Dept. of Public Welfare</u>, 883 F.2d 25 (5th Cir. 1989), in which the Fifth Circuit found that the interests of a plaintiff, who sued Mississippi officials for ignoring her complaints that her father had sexually abused her, were diametrically opposed to those of her custody-seeking father. The court noted that Rule 17(c) values a parent's rights to represent a child, but when the complaint "shows" a conflict of interest between the two, Rule 17(c) calls for the appointment of another representative who can better protect the plaintiff's interests. <u>Id.</u> at 27.

By no means does the Court suggest any similarities between the father in <u>Chrissy F.</u> and Juan Gonzalez. However, the reasoning of that case is applicable here, in that Plaintiff's Complaint "shows" a potential conflict of interest between Plaintiff's claim and the father's opposing view, as expressed by Defendants. While Lazaro Gonzalez is not Plaintiff's father,

---

[22]Defendants argue that Lazaro Gonzalez cannot function as a next friend because he would displace the rights of Juan Gonzalez as Plaintiff's legal representative under Rule 17(c). Yet the assumption that Juan Gonzalez is Plaintiff's legal guardian does not foreclose Lazaro Gonzalez's next friend status.

neither is he a stranger who has thrust himself into this lawsuit.[23] Lazaro Gonzalez has illustrated his dedication to Plaintiff's interests in several ways: He has embraced the responsibility of prosecuting the instant case; he has cared for Plaintiff in his own home for more than two months; and he demonstrated sufficient interest in the child such that the INS[24] itself placed Plaintiff in his hands on November 25, 1999.[25]

In Johns v. Department of Justice, 624 F.2d 522 (5th Cir. 1980), the Fifth Circuit addressed a situation in which a one-day-old child was taken from her birth mother in Mexico and brought to the United States, where she lived with an American couple—the Johns. After the INS ordered the child to be deported to Mexico, the Johns sought an injunction against deportation and a writ of habeas corpus in district court. The district court dismissed the case with prejudice, and the Johns appealed. See id. at 523. In remanding the case to the district court

---

[23]While Defendants strenuously object to Lazaro as next friend under Rule 17(c), they do not challenge Lazaro's legal capacity to represent Plaintiff under Rule 17(b).

[24]To the extent that it is asserted that the INS should assume the role of next friend in the instant litigation, the Court observes that although the INS has maintained custody over Plaintiff in the absence of his father, the INS would be prohibited from representing Plaintiff in the instant case, as the INS is an opposing party to this litigation. See, e.g., Rule 1.7, ABA Model Rules of Professional Conduct.

[25]The Court observes that while the INS placed Plaintiff with Lazaro Gonzalez, it has since indicated its opinion that "such placement does not confer upon Lazaro Gonzalez the authority to act on behalf of Elian in immigration matters or authorize representation in direct opposition to the express wishes of [Juan Gonzalez]." Letter from Michael A. Pearson, Executive Associate Commissioner for Field Operations, to Roger Bernstein and Spencer Eig of 1/5/00, Defendants' Notice of Filing Record and Exhibits, at 5-6.

The Court declines comment on the Florida state court case that found Lazaro to be a suitable temporary legal custodian for Plaintiff. See Temporary Protective Order, Gonzalez v. Gonzalez-Quintana, 00-00479 FC 29 (Fla. Cir. Ct. Jan. 10, 2000). Nevertheless, this finding supports the Court's conclusion that Lazaro is a proper next friend in the instant case.

for the appointment of a guardian ad litem, the Fifth Circuit found that neither the birth mother nor the Johns necessarily represented the interests of the child. See id. at 523-24.

Under different circumstances, the Court can envision other representatives for Plaintiff's interests in this litigation. However, Lazaro Gonzalez has shown that he has at heart Plaintiff's interests as an unadmitted alien applying for asylum. Accordingly, Lazaro Gonzalez is a proper next friend.

Last, but certainly not least, to the extent that Plaintiff's father feels prejudiced by the Court's holding that Lazaro Gonzalez is an appropriate next friend, the father may move to challenge this finding. See Garrick v. Weaver, 888 F.2d 687, 693 (10th Cir. 1989) (recognizing the right to request removal of a next friend and/or to have the Court appoint another representative to protect plaintiff's interests).

### 6.    **Proper Plaintiff Conclusion**

In conclusion, the Court finds that Plaintiff has standing to bring the instant case, and that Plaintiff is the real party in interest in this litigation. However, due to his young age, Plaintiff does not have capacity to sue. Thus, he needs someone to represent his interests, and the Court is satisfied that Lazaro Gonzalez represents Plaintiff's interests sufficiently under the next friend test. The Court next turns to Defendants' attack on the specific allegations of the Complaint.

### III. ANALYSIS OF THE COMPLAINT

**Summary of Part III**

Having found limited subject matter jurisdiction to consider the Complaint, and following its determinations as to the issues of standing and next friend, the Court turns to the particular

33

claims set forth within the Complaint, as well as the arguments relating to them.

As to Count I, the Court finds that Plaintiff has failed to state a claim for violations of constitutional due process. In its analysis of Count II, the Court concludes that the Attorney General acted within her discretion in determining, as a matter of law, both that Plaintiff's father is solely authorized to act on behalf of his son with respect to any decision to apply or not to apply for asylum, and that Plaintiff's applications for asylum need not be considered by the INS without the father's authorization. In light of its findings with regard to Count II, the Court determines that Plaintiff's claims under Counts III, IV, and V are without merit. Accordingly, the Complaint must be dismissed in its entirety.

## A.    Count I: Constitutional Due Process[26]

Under Count I of the Complaint, Plaintiff seeks relief for violations of constitutionally protected due process rights. Specifically, he charges that Defendants denied him due process by depriving him of the right to petition for asylum, declining to adjudicate his petitions for asylum and withholding of removal, and refusing to recognize his right to counsel. In their Motion, Defendants assert that Plaintiff's claim must be denied as a matter of law, and the Court agrees.

The procedural component of the Fifth Amendment's Due Process Clause protects against the deprivation of life, liberty, or property without "due process of law." U.S. Const. amd. V. The necessary first step in evaluating any procedural due process claim is determining whether a constitutionally protected interest has been implicated. See Economic Dev. Corp. v.

---

[26]For the purposes of the Court's analysis under Count I, the Court considers Defendants' Motion To Dismiss.

Stierheim, 782 F.2d 952, 954-55 (11th Cir. 1986) ("In assessing a claim based on an alleged

denial of procedural due process a court must first decide whether the complaining party has

been deprived of a constitutionally protected liberty or property interest. Absent such a

deprivation, there can be no denial of due process."). However, "expectation does not equate

with liberty or property, and a constitutionally protected interest cannot arise from relief that the

executive exercises unfettered discretion to award." Tefel v. Reno, 180 F.3d 1286, 1300 (11th

Cir. 1999) (citing Connecticut Bd. of Pardons v. Dumschat, 452 U.S. 458, 465 (1981)). In Tefel,

the Eleventh Circuit confirmed its prior holding in Garcia-Mir v. Meese, 788 F.2d 1446 (11th

Cir. 1986), "that the failure to receive discretionary relief in the immigration context does not

deprive an alien of a constitutionally protected liberty interest." Tefel, 180 F.3d at 130 (citing

Garcia-Mir, 788 F.2d 1446).

Plaintiff is an unadmitted alien, and as such, is treated as being "on the threshold of initial

entry" into the United States. Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212, 215

(1953). Plaintiff claims that because he has been paroled, he is entitled to the same constitutional

protections as all persons in the territorial jurisdiction of the United States. However, this

argument was expressly rejected in Jean v. Nelson, 727 F.2d 957, 969 (11th Cir. 1984) (quoting

Leng May Ma v. Barber, 357 U.S. 185, 188 (1958) ("The parole of aliens seeking admission is

simply a device through which needless confinement is avoided while administrative

proceedings are conducted. It was never intended to affect an alien's status.")).

Moreover, in Jean v. Nelson, the Eleventh Circuit specifically held that excludable (or

35

unadmitted)[27] aliens seeking parole pending determination of their claims for admission "are not within the protection of the Fifth Amendment." Jean, 727 F.2d at 968; see also Landon v. Plasencia, 459 U.S. 21, 32 (1982) ("[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application . . . ."). Additionally, the asylum provisions established by Congress do not create any constitutionally protected interests. See Jean, 727 F.2d at 984 ("Excludable aliens cannot challenge the decisions of executive officials with regard to their applications for admission, asylum, or parole on the basis of the rights guaranteed by the United States Constitution.").

Accordingly, in light of Plaintiff's status as an unadmitted alien, no set of facts will support Plaintiff's claim for a denial of constitutional due process under Count I, and this Count must be dismissed.

**B.      Count II: Violations of 8 U.S.C. § 1103(a) and 8 U.S.C. § 1158(a)[28]**

Count II of Plaintiff's Complaint alleges a violation of 8 U.S.C. § 1103(a) and 8 U.S.C. § 1158(a). As to Count II, Defendants' Motion hinges on the following narrow question: Did the Attorney General have the authority to determine that, in light of the express contrary wishes of Plaintiff's father, an application filed by someone else on six-year-old Plaintiff's behalf did not require adjudication on its merits? After careful consideration, the Court finds that the Attorney

---

[27]See supra note 8.

[28]For the purposes of the Court's analysis under Count II, the Court considers Defendants' Motion for Summary Judgment. Plaintiff objects to consideration of the Motion for Summary Judgment on the basis of a need for discovery; however, the Court finds that no discovery is required in order to rule on the Motion, which is ripe for adjudication.

General's determination is controlling, conclusive, not manifestly contrary to law, and not an abuse of her congressionally delegated discretion.

## 1. Analysis of Applicable Statutory Provisions

As a starting point for its analysis, the Court looks to 8 U.S.C. § 1103(a), which provides the following general statement about decisions of the Attorney General on questions of law:

> (1) The Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: Provided, however, [t]hat *determination and ruling by the Attorney General with respect to all questions of law shall be controlling.*

8 U.S.C. § 1103(a)(1) (emphasis added).[29]

Under 8 U.S.C. § 1158(a), Congress provides some guidance on the issue of who may apply for asylum:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a)(1).

---

[29]Section 1103(a) does not speak directly to review of the Attorney General's decisions in the asylum context; however, this provision does quite clearly provide a general grant of deference to decisions on "questions of law." 8 U.S.C. § 1103(a)(1). The Court observes, however, that section 1103(a) does not state explicitly that judicial review over decisions under section 1103(a) shall be precluded.

While section 1158(a) provides for authority to apply for asylum, it fails to set forth a

standard of review. For direction, the Court looks to 8 U.S.C. § 1252(b)(4)(D), which provides as

follows:

> Except as provided in paragraph (5)(B)—
>
> . . .
>
> (D) the Attorney General's discretionary judgment whether
> to grant relief under section 1158(a) of this title shall be conclusive
> unless manifestly contrary to the law and an abuse of discretion.

8 U.S.C. § 1252(b)(4)(D). This "manifestly contrary to the law and an abuse of discretion"

standard provides strong support for the proposition that Congress did not intend to provide for

much second-guessing of administrative decisions under section 1158(a).

### 2. Analysis of the Attorney General's Actions[30]

Before evaluating the actions taken by the Attorney General with regard to Plaintiff's

applications for asylum, the Court must properly characterize the Attorney General's decision at

issue. On January 5, 2000, attorneys purporting to represent Plaintiff wrote to the Attorney

General, asking that she determine whether the INS had properly followed its procedures in

dealing with Plaintiff's applications.

---

[30] Under 8 U.S.C. § 1103(a)(1), primary responsibility for enforcing and administering immigration law is vested in the Attorney General. See 8 U.S.C. § 1103. Pursuant to this authority, the Attorney General has delegated her ability to enforce immigration law to the Commissioner of the INS, who "may redelegate any such authority to any other officer or employee of the [INS]." 8 C.F.R. § 2.1.

While there are multiple defendants in this action, it is clear that the decision of the Attorney General, which was issued upon Plaintiff's request for review of the INS's decision, is controlling. The Court notes that Plaintiff did not include a copy of the Attorney General's January 12, 2000 letter with his Complaint; however, the letter was attached as Exhibit K to Plaintiff's Motion for Preliminary and Permanent Injunctive Relief.

Faced with an unprecedented set of circumstances—including a six-year-old child who had recently lost his mother, a father who had indicated (prior to his son's application for asylum) that he opposed any potential application for admission or asylum, the fact that the INS had conducted two in-person interviews with the father and had found no evidence of abuse, and principles of international standards that support the presumption that a parent speaks for his or her child[31]—the Attorney General found that the INS Commissioner had correctly concluded that the wishes of Juan Gonzalez properly had been granted.[32]

In her decision, the Attorney General concluded that Plaintiff is not competent to demonstrate an "intention to apply for asylum," and that "under universally accepted legal norms," Plaintiff's father should speak for Plaintiff. Letter from Attorney General Janet Reno to Spencer Eig, Roger Bernstein, and Linda Osberg-Braun of 1/12/00, Defendants' Notice of Filing Record and Exhibits, at 25-28.

The Attorney General's finding of incompetency on the part of Plaintiff, much like a federal court's determination of a prospective witness's capacity or competency to testify, is a threshold matter in need of resolution prior to the processing of Plaintiff's application. And like such determinations in federal court, the Attorney General's finding as to Plaintiff's competency is best characterized as a question of law.

---

[31]The Court again observes that Juan Gonzalez has filed no motion to intervene, or other challenge to the ability of Lazaro Gonzalez to speak for Plaintiff in the context of the above-captioned action.

[32]Clearly, the circumstances at issue differ significantly from those at issue in Reno v. Catholic Social Servs., Inc., 509 U.S. 43 (1993), in which a "front-desking" practice prohibited access to judicial review.

Under the facts alleged, and based on the nature of the issue of capacity to apply for

asylum considered by the Attorney General—specifically its character as a question of law—the

Attorney General's decision is controlling, <u>see</u> 8 U.S.C. § 1103(a), and thus dispositive of Count

II.

### 3. Deference Analysis

As an alternative basis for addressing Plaintiff's claims under Count II, the Court

considers Defendants' arguments relating to judicial deference to administrative decisionmaking.

### a.     Presumption of Deference to Administrative Decisionmaking

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 101 et seq., defines the role of

administrative agencies in the relationship among the three branches of government and the

American citizenry. In doing so, the APA provides administrative agencies with broad discretion

to establish policies and regulations, while imposing few limitations on that authority.

This broad discretion is extended by the manner in which federal courts assess the

propriety of administrative decisionmaking. Under the applicable standards of review, courts

give great deference to agency decisions. For example, pursuant to the APA, in the absence of

congressional intent indicating otherwise, courts hold agency findings and decisions unlawful

only if they are "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law.'" <u>Legal Environmental Assistance Foundation, Inc. v. EPA</u>, 118 F.3d 1467, 1473 (11th

Cir. 1997) (quoting 5 U.S.C. § 706(2)(A)).

In the event that courts reviewing an agency interpretation are presented with a statute

that is "silent or ambiguous" with regard to intent, or there is otherwise a "gap left, implicitly or

explicitly, by Congress," courts must ask whether the agency action at issue is based upon a

permissible interpretation of the statute. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984) (citing Morton v. Ruiz, 415 U.S. 199, 231 (1974)).

In Chevron, the Supreme Court set forth the following two-step analysis for judicial determinations regarding the propriety of agency action:

> If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction of the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a *permissible construction* of the statute.

Chevron, 467 U.S. at 842-43 (1984) (citations omitted) (emphasis added). The Supreme Court further noted that "[w]hen a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail." Id.[33]

The Supreme Court consistently has recognized, however, that the unique aspects of immigration law require a special approach. It is firmly established that immigration matters are

---

[33]In their Motion, Defendants direct the Court's attention to the case of Kleindienst v. Mandel, 408 U.S. 753 (1972), asserting that Kleindienst provides the applicable standard of review. In Kleindienst, the Supreme Court upheld the Attorney General's discretion to deny a waiver to allow an entry visa to a Marxist professor from Belgium who had violated the restrictions on his visa during an earlier visit. See id. Specifically, the Court held that when Congress delegates discretionary authority in the context of constitutional challenges, and "the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, the courts will [not] look behind the exercise of that discretion." Id. at 770.

Upon a review of the facts of the case, the Court finds that because the standard set forth in Kleindienst applies when a plaintiff asserts a *constitutional* challenge to agency action, the standard is inapplicable to the Court's analysis of Count II of the Complaint.

within the plenary control of Congress. See U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have Power . . . To establish an uniform Rule of Naturalization . . . ."); see also Fiallo v. Bell, 430 U.S. 787, 792 (1977) ("'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens.") (quoting Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 339 (1909)).

In the exercise of its plenary control, as evidenced in 8 U.S.C. § 1103 and other statutory provisions, Congress has made "sweeping . . . delegations of authority" to the Attorney General in the context of immigration matters. Jean v. Nelson, 727 F.2d 957, 965 (11th Cir. 1984); see, e.g., United States v. Shaughnessy, 353 U.S. 72, 78 (1957) (holding that where Congress fails to specify standards to guide the Attorney General's discretion in immigration, the Attorney General may rely on any reasonable factors).

The Supreme Court has acknowledged this broad exercise of congressional authority, "recogniz[ing] that judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations." INS v. Aguirre-Aguirre, 119 S. Ct. 1439, 1445 (1999). The Court has further observed that "[t]he judiciary is not well positioned to shoulder primary responsibility for assessing the likelihood and importance of [certain] diplomatic repercussions." Id.; see also Hampton v. Mow Sun Wong, 426 U.S. 88, 101-02 n.21 (1976) ("[T]he power over aliens is of a political character and therefore subject only to narrow judicial review.").

      **b.**      **"Silence or Ambiguity of 8 U.S.C. § 1158(a)**

Under Chevron, where a statute is "silent or ambiguous," actions by the Attorney General are to be reviewed for a determination of whether the agency's judgment call was based upon a

42

"permissible construction of the statute." 467 U.S. at 842-43. As the Eleventh Circuit has noted

in Herman v. NationsBank Trust Co., 126 F.3d 1354 (11th Cir. 1997):

> Under Chevron a court is not to search for what in the court's view
> is the best possible construction of the statute . . . . Realizing that
> administrators and judges might well disagree about the wisdom of
> a policy behind an agency's construction of a statutory provision,
> the Supreme Court admonished courts not to forget to whom the
> authority and responsibility for such policy making is entrusted.

Id. at 1363 (quoting Jaramillo v. INS, 1 F.3d 1149, 1152 (11th Cir. 1993) (en banc).

        Plaintiff asserts that the language of section 1158(a) is clear and unambiguous, thus

precluding an analysis under Chevron. However, upon a closer examination of section 1158(a),

in the context of other pertinent statutory provisions,[34] the Court is unconvinced that Plaintiff's

narrow reading is an appropriate construction of the statutory language. Rather, for the reasons

discussed below, the Court agrees with Defendants' argument that 8 U.S.C. § 1158(a) falls into

the category of statutes that are "silent or ambiguous," or otherwise contain a "gap left, implicitly

or explicitly, by Congress." Chevron, 467 U.S. at 842-43 (1984) (citing Morton v. Ruiz, 415 U.S.

199, 231 (1974)).

        To begin, 8 U.S.C. § 1158(a) fails to mention one particular class of aliens—children.

This could be construed as silence, in light of the fact that in immigration law, Congress and the

INS often make special provisions for children and others who may have difficulty acting in their

own best interests. See, e.g., 8 U.S.C. § 1182 (a)(9)(B)(iii)(I) ("No period of time in which an

alien is *under 18 years of age* shall be taken into account in determining the period of unlawful

---

        [34]In order to determine whether an agency's interpretation constitutes a permissible
construction, a court must look to the structure and language of the statute as a whole. See Kmart
Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988).

presence in the United States under clause (i).") (emphasis added); <u>Perez-Funez v. INS</u>, 619 F.
Supp. 656, 661 (C.D. Cal. 1985) ("The Court notes that, as discussed above, INS policy treats
children *fourteen years of age and older* differently from younger class members.") (emphasis
added); 8 C.F.R. § 236.2(a) ("If the respondent is confined, or if he or she is an incompetent, *or a
minor under the age of 14*, the notice to appear, and the warrant of arrest, if issued, shall be
served in the manner prescribed in § 239.1 of this chapter . . . .") (emphasis added); 8 C.F.R. §
240.38 ("Every alien *14 years of age or older* who is excluded from admission to the United
States by an immigration judge shall be fingerprinted . . . .") (emphasis added). In light of these
examples of age-specific provisions, it is apparent that Congress and the INS recognize that
children deserve special treatment under immigration law.

Plaintiff would have the Court focus purely on 8 U.S.C. § 1158(a)(1) to the exclusion of
the remainder of section 1158 and other portions of the INA. However, for the Court to do so
would be to reject firmly established principles of statutory interpretation that guide this Court's
analysis, as well as to accept the logical extension of Plaintiff's argument, which is that Congress
requires the Attorney General to adjudicate asylum applications from all children—no matter
how young in age, no matter who claims to speak for them, and no matter what their mental
condition.[35] This conclusion seems especially unreasonable in light of the potential harm that

---

[35]This is not to say that the INS should, as a matter of course, prohibit children from
applying for asylum when their parents oppose the application. Rather, the INS seems to
contemplate occasional parental conflict in the context of unaccompanied juvenile aliens. <u>See</u> 8
C.F.R. 236.3(e) ("If a parent of a juvenile detained by the [INS] can be located, and is otherwise
suitable to receive custody of the juvenile, and the juvenile indicates a refusal to be released to
his or her parent, the parent(s) shall be notified of the juvenile's refusal to be released to the
parent(s), and shall be afforded an opportunity to present their views to the district director, chief
patrol agent, or immigration judge before a custody determination is made.").

may result to a child on whose behalf an asylum application is filed.[36]

Consider, as an example, the case in which a child is kidnapped abroad, brought to the United States, and an application for asylum is filed on his or her behalf by the kidnapper. In that case, Plaintiff would have the Court believe that even if the Attorney General were aware that the child had been kidnapped, the Attorney General would be obligated to accept the application. While it is true that the Attorney General would have an ability to deny the application following an adjudication, this would not alter the fact that the child's status under 8 U.S.C. § 1158(a) would have changed.[37]

Moreover, if Congress truly intended section 1158(a) to permit any alien to apply for asylum, why enact 8 U.S.C. § 1252(b)(4)(D) at all?[38] The fact that section 1252(b)(4)(D) provides a standard of review for "discretionary judgment" exercised by the Attorney General

---

[36]The Court observes that if asylum is rejected, the child would lose his or her ability to apply for asylum again at any point in the future. See 8 U.S.C. § 1158(a)(2)(c) (providing that if an alien has applied for and been denied asylum, he or she may not apply for asylum again); see also 8 U.S.C. § 1158(d)(6) ("If the Attorney General determines that an alien has knowingly made a frivolous application for asylum . . . , the alien shall be permanently ineligible for any benefits under this chapter . . . ."); see also Polovchak v. Meese, 774 F.2d 731 (7th Cir. 1985) (holding that the government violated the due process rights of a minor resident alien's parents by granting asylum to the alien without giving the parents notice and an opportunity to be heard).

[37]The Court acknowledges that the Attorney General has discretion to consider changed circumstances under 8 U.S.C. § 1158(a)(2)(D); however, this does not obviate the additional barrier that the kidnapped child would face in the future upon an attempt to file a new application for asylum.

[38]The Court also observes that the scope of 8 U.S.C. § 1252(b)(4)(D), in providing a standard of review for decisions under 8 U.S.C. § 1158(a), must apply only to section 1158(a)(1), as judicial review is explicitly precluded as to section 1158(a)(2) by section 1158(a)(3) ("No court shall have jurisdiction to review any determinations of the Attorney General under paragraph (2)."). See also discussion supra at 18.

45

under section 1158(a) is the dagger to the heart of Plaintiff's request.[39]

This conclusion is bolstered by the fact that within 8 U.S.C. § 1158(a)(2), Congress has provided for exceptions to the term "[a]ny alien." These include aliens who: 1) may be removed to a safe third country, 2) have failed to file for asylum within one year of arriving in the United States, or 3) have previously applied for and been denied asylum. See 8 U.S.C. § 1158(a)(2). Thus, "[a]ny alien" was evidently not intended by Congress literally to include *all* aliens.

Due to the failure of 8 U.S.C. § 1158(a) to address minors, as well as the fact that the word "[a]ny" in "[a]ny alien" is internally contradicted by 8 U.S.C. § 1158(a)(2), the Court concludes that the words "[a]ny alien" cannot be read as literally as Plaintiff suggests to the Court,[40] and that 8 U.S.C. § 1158(a), regardless of the reason,[41] is sufficiently "silent or ambiguous" to warrant an analysis under Chevron.

---

[39] To find otherwise would be to attribute to Congress an intentional inconsistency between these statutory provisions, and the Court hesitates to make such a finding. See Hughey v. JMS Dev. Corp., 78 F.3d 1523, 1529 (11th Cir. 1996) ("Congress is presumed not to have intended absurd (impossible) results.").

[40] See United States v. Kirby, 74 U.S. (7 Wall.) 482, 486-87 (1868) ("All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter.").

[41] As Justice Scalia has eloquently articulated,
> In the vast majority of cases I expect that Congress neither (1) intended a single result, nor (2) meant to confer discretion upon the agency, but rather (3) didn't think about the matter at all. If I am correct in that, then any rule adopted in this field represents merely a fictional, presumed intent, and operates principally as a background rule of law against which Congress can legislate.

Antonin Scalia, Judicial Deference to Administrative Interpretations of Law, 1989 Duke L.J. 511, 517 (1989).

46

Having found that the statute is "silent or ambiguous," the pertinent question is whether the Attorney General's construction of 8 U.S.C. § 1158(a) was a "permissible interpretation." The Court finds that, in light of the discretion afforded to the Attorney General and the pertinent statutory provisions treating children differently from adults, the interpretation of the Attorney General was permissible, and relief cannot be awarded under Count II.

C.    **Counts III and IV: Violations of 8 C.F.R. § 208.9 and 8 C.F.R. § 208.14(b)**

Following its determination that the decision of the Attorney General is controlling both on the issue of Plaintiff's capacity to file an application for asylum and on the question of who may speak for Plaintiff in the face of Plaintiff's incompetence, the Court addresses briefly Plaintiff's claims under Counts III and IV that Defendants violated specific regulations.

Under Counts III and IV of the Complaint, Plaintiff sets forth claims under 8 C.F.R. § 208.9 and 8 C.F.R. § 208.14(b), which are regulatory provisions promulgated pursuant to the authority of the Attorney General to administer and enforce all laws relating to the immigration and naturalization of aliens.[42] See 8 U.S.C. § 1103(a); 8 U.S.C. 1158(d)(1) (expressly directing the Attorney General to "establish a procedure for the consideration of asylum applications").

As noted above, the Attorney General's determination as to Plaintiff's capacity to apply for asylum is controlling, and in light of that conclusion, no asylum applications are pending. Therefore, Counts III and IV must fail.

---

[42]Plaintiff does not challenge the promulgation of the cited regulations. Rather, he disputes whether Defendants properly applied these regulations to his application for asylum.

47

**D.      Count V: Petition for Writ of Mandamus**

In Count V, Plaintiff seeks relief in the form of a writ of mandamus compelling

Defendants to comply with their procedures for adjudicating asylum applications. Under 28

U.S.C. § 1361, this Court shall issue a writ "to compel an officer or employee of the United

States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

A writ of mandamus is inappropriate, however, as to the exercise of a discretionary duty.

See Einhorn v. DeWitt, 618 F.2d 347, 349 (5th Cir. 1980). In light of the Court's findings above,

to the extent that any duty existed with respect to the consideration of Plaintiff's applications for

asylum, that duty was discretionary. Accordingly, the issuance of a writ would be inappropriate

in this case, and Count V must fail as a matter of law.

### III. CONCLUSION

In the final analysis, a well-intended lawsuit filed on behalf of and for the benefit of Elian Gonzalez ran headlong into an equally well-intended Attorney General, sworn to uphold the letter and spirit of the immigration law, and determined to see that a father's wishes to be reunited with his six-year-old son be given primacy in law and fact.

At age six, Elian's recorded past is a profile of survival and courage in the face of adversity and the loss of his mother at sea. His future will undoubtedly unfold in due time, and it will surely remain a matter of interest to those who oppose his father's wishes.

Even this well-intended litigation has the capacity to bring about unintended harm. In light of the Attorney General's clearly articulated views on the matter of whether Elian Gonzalez should return home, as well as the reality that each passing day is another day lost between Juan Gonzalez and his son, the Court can only hope that those on each side of this litigation place the interests of Elian Gonzalez above all others.

From the outset, Plaintiff's counsel have urged that this lawsuit does not seek asylum, but rather seeks to vindicate a procedural right to apply for asylum. The determination to grant asylum is a matter within the discretion of the Attorney General. She has decided the issue of who may speak for Plaintiff, and her decision, by statute and in the exercise of congressionally delegated discretion, is controlling as a matter of law. A judicial review of the exercise of that discretion by the undersigned has found no abuse that would warrant a contrary conclusion.

BASED UPON the foregoing, it is hereby

ORDERED AND ADJUDGED that the Motion To Dismiss or Alternative Motion for Summary Judgment is GRANTED. Accordingly, the above-captioned action is DISMISSED.

49

DONE AND ORDERED in Chambers at Miami, Florida, this 21st day of March, 2000.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:    Linda Osberg-Braun
        Roger A. Bernstein
        Barbara Lagoa
        Judd J. Goldberg
        Eliot Pedrosa
        Kendall Coffey
        Spencer Eig
        Jose Garcia-Pedrosa
        Thomas E. Scott
        Dexter A. Lee
        David W. Ogden
        Patricia L. Maher
        Thomas W. Hussey
        David J. Kline
        William J. Howard
        Jocelyn M. Wright
        Russell J.E. Verby
        John P. Moran
        Michelle Gorden