UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-206-CV-MOORE
Magistrate Judge O'Sullivan

CO   JUN 28  AM 10: 52

ELIAN GONZALEZ, a minor, by and through
LAZARO GONZALEZ, as next friend, or
alternatively, as temporary legal custodian,

      Plaintiff,

v.

JANET RENO, Attorney General Of The United
States; DORIS MEISSNER, Commissioner,
United States Immigration And Naturalization
Service; ROBERT WALLIS, District Director,
UNITED STATES IMMIGRATION AND
NATURALIZATION SERVICE; UNITED
STATES IMMIGRATION AND
NATURALIZATION SERVICE; and UNITED
STATES DEPARTMENT OF JUSTICE,

      Defendants.

_____/

**PLAINTIFF'S EMERGENCY MOTION FOR RELIEF FROM JUDGMENT
AND APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND/OR PRELIMINARY INJUNCTION**

**I.**     **Introduction.**

    Since the Court entered judgment in this matter on March 19, 2000, Plaintiff has learned of

compelling new evidence that requires this matter be reopened. This evidence consists of internal

documentation only just recently produced by the Immigration and Naturalization Service ("INS")

to a public interest legal foundation, which demonstrates that U.S. Government officials first

determined to send Plaintiff back to Fidel Castro's Communist Regime in Cuba, then set about



determining how to achieve this result.  More disturbingly, this newly discovered evidence also demonstrates that these officials sought and received the assistance of Cuban officials to send Plaintiff back to Cuba, and were less than fully candid, if not plainly dishonest, with the Court about its decision-making process.  Accordingly, the Court should reopen this matter and allow Plaintiff to develop a full and complete record through discovery, including the deposition of relevant officials. In addition, the Court also should grant a temporary restraining order and/or preliminary injunction enjoining Plaintiff's removal from the United States until such time as a full, complete and **accurate** record has been developed and the Court has had the opportunity to consider the true facts behind what has occurred in this extraordinary case.

## II.    Factual Background.

On January 5, 2000, the INS wrote to Plaintiff's lawyer and Miami relatives advising them of its decision not to consider Plaintiff's petition for asylum.  Two days later, on January 7, 2000, Judicial Watch, Inc. ("Judicial Watch"), a public interest legal foundation based in Washington, D.C. and with offices in Miami, Florida, filed a Freedom of Information Act ("FOIA") request seeking documents from the INS concerning that decision.  *See* Declaration of Thomas J. Fitton ("Fitton Decl."), at para. 2.  The INS failed to produce any of the requested documents to Judicial Watch, forcing it to file a lawsuit on April 4, 2000 in the U.S. District Court for the District of Columbia, *Judicial Watch, Inc. v. Attorney General Janet Reno, et al.*, Case Number 1:00CV00723 (D. District of Columbia).  *Id.* at para. 3.  It was only when the court in that action required the INS to start turning over documents to Judicial Watch that Plaintiff began to learn the true facts of how and when the government had determined his fate.

Specifically, the INS began releasing documents to Judicial Watch on May 23, 2000, well after this Court's March 19, 2000 decision. *Id.* at para. 4. Additional releases were made on May 30, 2000, June 8, 2000 and June 12, 2000. *Id.* On or about June 7, 2000, Judicial Watch began forwarding some of the documents it had received from the INS to Plaintiff's counsel. *Id.* at para. 5. Copies of these documents are attached as Exhibit 1 to the Fitton Decl.

On June 13, 2000, Plaintiff's counsel wrote to Attorney General Janet Reno and INS Commissioner Doris Meissner demanding an explanation of these documents, which had been requested by Plaintiff in discovery but never produced:

> **We received, for the first time last week, a number of documents forwarded to us from Judicial Watch, Inc.** These documents appear to be internal INS records and raise serious questions about the extreme irregularities and other troubling conduct of the INS in the Elian Gonzalez matter. We are therefore writing to highlight some of our concerns and to demand prompt and responsive explanations.
>
> *        *        *
>
> We respectfully demand your immediate attention to these inquiries, which are based not on speculation, but upon your own documents. Given your professed sense of urgency about matters concerning Elian, we insist that these questions be responded to immediately so that we can properly evaluate the legal consequences of these documents and determine any appropriate legal remedies. **As you know, the documents were all requested in discovery in district court proceedings below, but the INS refused to produce them. And yet, although these appear to be only a fraction of the documents we properly sought through civil discovery, even this small sampling reflects gross irregularities, manifest political influences, abject inconsistencies with positions taken judicially and direct collaboration with Castro's communist regime.** Ironically, court decisions to date have tolerated the INS' own decisions based on the judicial assumption that the INS has acted responsibly, free from questions of political expediency and in accordance with regular agency decision-making. These documents appear to shatter those premises and are extremely serious matters which you cannot ignore. We look forward to hearing from you without delay.

*Id.* at Exhibit 2. While Plaintiff's letter clearly called for a response, both by its own terms and as a matter of law, neither Attorney General Reno, Commissioner Meissner nor any other official ever responded.

These key documents are of the utmost importance to this case because they are both new evidence and they contradict many of the factual claims made by Defendants about how the decision to reject Plaintiff's asylum application was made. Far from showing that the INS "acted responsibly, free from questions of political expediency and in accordance with regular agency decision-making," the documents show that, as early as mid-December 1999, the INS had pre-determined, without any real factfinding, that Plaintiff must be returned to Castro's Communist regime in Cuba. Even worse, the documents also show that top officials in the INS coordinated with White House and other Administration officials -- as well as with Cuba's Communist officials -- to effectuate Plaintiff's return to Cuba. So stark is the contrast between this newly discovered evidence and the representations made in the pleadings that only one conclusion can be reached: the INS deliberately misrepresented the facts to this Court in an attempt to prevent its improper "decision-making process" from becoming known.

For example, while the INS has continually represented to this Court and the American people that it made its determination to return Plaintiff to Cuba in early January, 2000, and that the Commissioner "had reached her decision through a careful and thorough process" which "includ[ed] information from the three interviews," this newly discovered evidence clearly demonstrates that this is false. *See, e.g.*, Defendant's Motion to Dismiss or Alternative Motion for Summary Judgment, And Opposition to Plaintiff's Motion for Preliminary Injunctive Relief and Petition for Writ of Mandamus ("Motion to Dismiss") at 28. However, in "talking points" prepared by the INS to try to placate

Cuban officials on or about December 11, 1999, the INS made clear that, pursuant to an apparent deal between the two countries, it agreed with Castro's Communist regime that Plaintiff should be returned to Cuba:

> **We understand your frustration that we cannot assure the immediate return of the minor Elian Gonzalez. We, too, are committed to resolving this situation as quickly as possible** in order to avoid further hardship to the boy . . . **The father is the best person to express his own wishes on behalf of the child,** and those wishes will be more credible and persuasive if they come directly from him.

*See* Fitton Decl. at Exhibit 1, pg. 68-69 (emphasis added). Of course, while the INS claimed in Court that it took several weeks, at least three interviews, and much careful deliberation to reach this conclusion on January 5, 2000, the "talking points" make clear that it sought to satisfy Fidel Castro from the start, had decided to return Plaintiff to Cuba long before January 5, 2000, and, in the interim, had set about to justify its decision after-the-fact.

It is also apparent, contrary to the INS' claims, that it not only reached its decision at least as early as mid-December 1999, but that it even had drafts of its January 5, 2000 letters to Plaintiff's Miami relatives and lawyers prepared by December 16, 1999 -- several days before its December 20, 1999 interview of Plaintiffs' Miami relatives or its December 31, 1999 follow-up interview of Plaintiff's father. Specifically, e-mail between INS officials on December 16, 1999 refer to proposed language about "tourist visas" for "return visits by Elian and/or his father," obviously so that Plaintiff and his father could return to the United States from Cuba. *See* Fitton Decl. at Exhibit 1, pg. 25 and 73. According to one, December 16, 1999 e-mail, this proposed language had been approved by "Consular Affairs" and read: "If Elian and his immediate family wished to apply for tourist visas at some point in the future, the Consular Section at the U.S. Interests Section in Havana would, of course, consider them very favorably." *Id.* at 73. In its Motion to Dismiss, the INS disingenuously

quoted from this exact same language, as set forth in its January 5, 2000 letter to Plaintiff's Miami relatives, as purported evidence of its concern for Elian. *See* Motion to Dismiss at 24.

Forwarded with this and other December 16, 1999 e-mails were drafts of the final letters. *See* Fitton Decl. at Exhibit 1, pg. 25 ("Here is a revision to the letter to the family and attorney . . . ." "Here are the two drafts. The first **elianlttr5** is to Lazaro Gonzalez and to Roger Bernstein. The second **elianlttr6** its to Juan Miquel Gonzalez.") (emphasis added); *see also id.* at 58. It is obvious that these e-mails refer to the INS' January 5, 2000 final decision because, on that date, it sent letters to Lazaro Gonzalez, Roger Bernstein, Esq. and Spencer Eig, Esq., and Plaintiff's father. *See* Fitton Decl. at Exhibit 3. The letter to Lazaro Gonzalez contained the exact same language referenced in the December 16, 1999 e-mail regarding tourist visas, should Plaintiff and his father one day seek to visit the United States. *Id.*

Similarly, a December 29, 1999 document also discloses that there was no doubt from the start as to **what** the INS' ultimate decision would be, the only question was **when** it would be made public. *See* Fitton Decl. at Exhibit 1, pg. 17 ("Since it appeared that the decision would not be that which the community is requesting, our meeting addressed security and security related issues arising from what we expect will be demonstrations."). Clearly, and contrary to the INS' representations to the Court and to the American people, the decision to send Plaintiff back to Cuba was made long before the INS purportedly completed its "careful and thorough process" on January 5, 2000, which purportedly "includ[ed] information from the three interviews" of Plaintiff's father and Miami relatives. *See* Motion to Dismiss at 28. The newly discovered evidence thus demonstrates that this is false.

Moreover, while the INS advised the Court that, early on in this matter, its District Director

in Miami merely "responded" by letter dated December 8, 1999 to Plaintiff's father's purported

request for the return of his son (*see* Motion to Dismiss at 9-10), it neglected to advise the Court that

the District Director was apparently ordered by INS officials in Washington, D.C. to sign the letter:

> Bob and Jack B advise that Blackman has requested that you and I prepare a
> document of the sorts addressing legal issues that we might see and legal avenues that
> might be taken in relation to the letter that [District Director] Wallis **was told to and
> did sign**.

*See* Fitton Decl. at Exhibit 1, pg. 75 (emphasis added). This December 9, 1999 e-mail continues:

> In an informal telecon with Bob and Scott, I already advised that it was my view that
> 8 CFR 236.3(f), the reg that those in DC are apparently relying on as the basis for
> sending the letter to the father in Cuba, is inapplicable. Two reasons both from a
> black letter law reading. The first is that the reg only applies to a "parent . . . residing
> in the" U.S.

*Id.* Thus, the INS' own field attorneys had serious reservations about the unlawful course of action

being dictated by officials in Washington, D.C. In another e-mail on or before this same date, this

same INS attorney strenuously objected to INS' headquarters' actions:

> When asked why we sent the letter and we cite the reg., what is the INS spokesperson
> going to say when/if someone reads the black letter law to them?
>
> What is INS going to say if someone asks why, if the reg didn't require notice, we
> moved forward as we did?
>
> . . . What is the INS defense if, burden met, father demands child returned . . . and
> lawyers for Miami Cubans run to fed court on a habeas/mandamus/TRO (INS has no
> right to pick child up/keep in custody. See Commsr's Cuban Arrival Memo. Virtue's
> Cuban Parole memo. Cf. Prior Cuban Arrival Release practices. **Foreign based
> father has no standing -- at least until court rules on the issue of parental rights
> -- and INS is giving him rights in violation of law. Child has right to pursue
> relief, etc.)** . . .
>
> **As noted it is my view that the reg. is clear. INS has no LEGAL obligation to
> contact the father. The INS may have no legal basis to make a determination**

> **on that issue.  Moreover, the INS may have not a basis on which to honor the father's wishes, over the US guardian's wishes; at least until the parental rights/private cause of action issue is resolved by a court or authority of competent jurisdiction . . . I must assume that even these points are probably not going to influence anyone in Washington.**

*See* Fitton Decl. at Exhibit 1, pg. 93-94 (emphasis added).  Thus, even INS attorneys, using the law and internal regulations to back them up, could not persuade INS officials in Washington, D.C. to alter a pre-judged decision that the INS told this Court was made a month later.  Of course, the e-mail shows that the decision had been made by at least mid-December, 1999, and the INS obviously misled this Court when it falsely represented that the decision to return Plaintiff to Cuba was made on January 5, 2000.

Another INS document shows the thorough dishonesty of the INS Commissioner and, thus, the dishonesty of her agency in their dealings with issues before this Court.  An e-mail of January 15, 2000 proves that the INS was even willing to lie in order to insure Plaintiff's return to Communist Cuba:

> Late yesterday we, had a long discussion of the 2 grandmother idea(s) with the Commissioner . . . First of all [Doris Meissner] thinks it would be helpful to discuss the idea here in Washington and in Cuba because the grandmothers' presence in the US, at some future date could well facilitate Elian's return to Cuba.  However she would like the discussion to continue with the following caveats:

> 1)      Arrival should not precede the court's decision: From INS' point of view it would not be helpful for the grandmothers to arrive before a decision is made in federal court.  We are not in a position to turn Elian over to them (temporarily or for return to Cuba) prior to a federal court decision and we are committed to seeking a federal court decision . . . [Meissner] would like the conversation to proceed, but with the understanding that we're talking about a post-decision arrival.

> 2)      No INS involvement.  We spent a great deal of time discussing how the grandmothers' visit could be facilitated.  The conclusion reached was that INS cannot assume the role of facilitator for this visit, nor provide access to Elian.  DM was FIRM about not having any involvement in this initiative.  If our conversations in Cuba

> can proceed with the understanding that INS would not be involved, then DM would
> be most interested in hearing more about this case.
>
> Our contacts in Miami believe that the Catholic Church in Miami would respond to
> a direct (via Cardinal Ortega) request from the grandmothers for the Church's
> assistance in scheduling a visit.  Miami's advice was to have the grandmothers use
> Cardinal Ortega's office to make contact with either Cardinal Law [of Boston] or
> Archbishop Favalora in Miami.  Such a plea coming from the grandmothers would be
> very difficult for the church to ignore.

*See* Fitton Decl. at Exhibit 1, pg. 116.  The document thus shows that the INS, with the approval of

its Commissioner Meissner, actively masterminded, approved, coordinated and directed discussions

with Communist Cuba to time the arrival of Elian's grandmothers from Cuba, in an apparent effort

to shape public opinion and influence the Court.  And yet at the same time, Meissner dishonestly

sought to wipe the INS' fingerprints off the grandmothers' visit.  Meissner was even willing to misuse

cardinals of the Roman Catholic Church to mask the INS' and Communist Cuba's joint effort to bring

Elian's grandmothers to the United States.

Additionally, contrary to the INS' representations to this Court that it followed regular,

agency decision-making processes in determining not to consider Plaintiff's asylum application, the

documents demonstrate that the INS' handling of Plaintiff's asylum application was far outside the

parameters of normal INS procedures.  As a December 17, 1999 e-mail demonstrates with regard to

a second asylum application filed by Plaintiff:

> This is a heads-up.  You did such a good job with Elian's first application they are
> going to make you do it again, only make it a little more difficult.  The details are
> sketchy and subject to change. Per Christine Davidson, from HQ Asylum, it appears
> that someone has submitted another application on Elian's behalf . . . as with his first
> application, your goal is to intercept it and get it to Mr. Burzynski.

*See* Fitton Decl. at Exhibit 1, pg. 4.  A later e-mail states: "It looks like we need to repeat the last drill

and intercept Elian's latest I-589 . . . ." *See* Fitton Decl. at Exhibit 1, pg. 99.  While Plaintiff notes

the smarmy language of both e-mail documents, Plaintiff knows of no INS rules or procedures that authorize the "interception" of asylum applications by government personnel. The e-mails thus demonstrate how Plaintiff's applications were "marked," or pre-judged, from the very beginning.

Yet another newly discovered document demonstrates that the INS even coordinated its actions with the entity paying the legal fees of Plaintiff's father's lawyers. On or about January 25, 2000, INS Commissioner Meissner sent an "urgent" handwritten facsimile to Joan Campbell, the head of the National Council of Churches, which hired attorney Gregory Craig and pays Plaintiff's father's attorneys' fees. The facsimile states, in pertinent part:

> Your cell phone mesg box full and hotel voice mail only (sic). Have positive reply to 3:30 deadline from gt. uncle's lawyers. Now negotiating ground rules. Need to know where there is and is not flexibility re your presence and other issues. Give me a way to reach you as immediately as possible in the next few hours.

*See* Fitton Decl. at Exhibit 1, pg. 119. It is highly unusual, to say the least, for an agency to be coordinating in such a manner with an entity that is paying the legal fees of interested party before it, especially where the agency has just ruled in favor of that party. The document thus demonstrates the substantial likelihood that the leftist National Council of Churches and Gregory Craig -- one of the President's own personal lawyers -- are also participants in this attempt to mastermind Plaintiff's return to Cuba without regard for the facts, the law or Plaintiff's rights.

The documents also demonstrate that the INS' "decision-making" was infected by concern about The White House's reaction to this Elian matter. Handwritten notes dated January 19, 2000 show that in considering how to respond, presumably to congressional moves to give Elian Gonzalez citizenship, the INS feared the "danger is we'd be stepping on White House." *See* Fitton Decl. at Exhibit 1, pg. 1 (emphasis original); *see also id.* at 42 (INS trying to "resolve some thorny legal

questions" for the "DOS and the White House" concerning the "Cuban boy."). While the INS and Attorney General Reno have repeatedly represented to the Court and to the American people that this entire issue is only about "a boy and his father" (*see*, *e.g.*, Transcript of Hearing Proceedings Before the Honorable Michael K. Moore, March 9, 2000, at 60), this document demonstrates that they were as concerned, if not more concerned, about acting contrary to the interests of The White House, which had cut an apparent deal with Castro's Communist regime to return the boy to Cuba no matter what the facts or the law.

Again contrary to their pronouncements to this Court, the documents further demonstrate that the INS was driven by its litigation strategy. Handwritten notes on a press release announcing the INS' January 5, 2000 decision state that there "will be litigation." *See* Fitton Decl. at Exhibit 1, pg. 8-9. As early as December 17, 1999, various strategies were discussed with the premise that "the courts could get involved, and in this case will get involved." *See* Fitton Decl. at Exhibit 1, pg. 82-83. True to the Administration's apparent deal with Castro's Communist regime, the INS even got the Cuban government involved in preparing its litigation strategy long before any litigation was initiated and even before the INS had announced its January 5, 2000 decision. In a flurry of e-mails on December 16, 1999, INS officials write.

> . . . I think you have all the relevant documentation from the Government of Cuba in the matter . . .
>
> . . . Also I don't mean to insert myself as a necessary intermediary between litigator and "client" for the purposes of collecting the evidence. I did it on the first round just to make sure we were fully coordinated on the basics. Feel free to do it the "old fashioned way," and of course to call upon me or James if we can help out in any way.
>
> . . . We also need any documents/translations from Cuba, whether from the govt or from Juan Gonzalez, to the U.S. asking for the boy's return . . .

-11-

*See* Fitton Decl. at Exhibit 1, pg. 59-60; *see also id.* at 10 ("[h]ere is the litigator's cut on the statement . . . . ").

The INS' dishonesty in this regard can be seen at its worst in December 29, 1999 e-mail detailing a conference call in which INS Commissioner Doris Meissner participated. During this conference call, the INS discusses the allegations that Plaintiff's father was being coerced by Castro's Communist regime. It was decided, from the "most beneficial litigation point of view," to try to re-interview Plaintiff's father. In order to assuage Castro and obtain the interview, INS Commissioner Meissner proposed collaborating further with the Cuban government to keep the second interview secret:

> Furthermore it was stated that the Cuban government would be advised that the US government would not disclose to anyone that an additional interview would take place.

*See* Fitton Decl. at Exhibit 1, pg. 17-18. (It also is this same document that showed, regardless of the outcome of this second interview of Plaintiff's father, which did not take place until two days later, that the January 5, 2000 decision was preordained: "Since it appeared that the decision would not be that which the [Miami Cuban-American] community is requesting, our meeting addressed security and security related issues arising from what we expect will be demonstrations."). *Id.* These documents thus show that virtually everything the INS did related to its litigation posture, not to any normal administrative process.

In contrast to the document showing that Plaintiff's father was being coerced, the INS had a report showing that Plaintiff was thriving with his Miami relatives. Among the newly disclosed documents is also a Home Visit Report that describes in glowing terms Plaintiff's placement with his Miami relatives. The staff conclusion states:

-12-

It is the staff's strong opinion and feeling that the child has found a good place to live with his great uncle and family who give a genuine impression that they want the child very much and are devoted already to making their home his home and for him to feel very much part of the family. For all already said, staff is confident that Elian will have a new start in a safe and loving environment with people who have stated that he is an angel God sent to them for a purpose and that he is truly a miracle . . .

*See* Fitton Decl. at Exhibit 1, pg. 14-16. The staff concludes: "There is no reservation on part of staff as to well being of the child with his family here in Miami. Best of Fortune to cute Elian and Family!" *Id.* at 16. The INS never so much as mentioned this extremely positive, internal report about the family to the Court or to the media. By contrast, while it publicly professed great concern to this Court and to the American people about the need of Plaintiff's father to see his son, its own internal documentation is quite different, and quite callous: "Does it make sense to push for the father coming to the U.S. at this point? I don't think it would serve much purpose, unless we wanted to take his deposition." *See* Fitton Decl. at Exhibit 1, pg. 46.[1]

The documents also show that, contrary to the INS' repeated claims about the uniqueness of this matter, the "immigration law of the United States" **did** supply a "clear answer." They also show that the INS did **not** develop a "policy" to "deal with the extraordinary circumstances" that the INS

---

[1]     The January 3, 2000 memorandum from INS General Counsel Bo Cooper to INS Commissioner Meissner, which the INS claims as the basis for its January 5, 2000 decision to reject Plaintiff's asylum application, states that, "were Elian's father to come to the United States to assert his parental authority, we believe that the INS would be required to recognize Elian's father's interest with respect to all immigration matters involving Elian." *See* Fitton Decl. at Exhibit 4, pg. 7. The memorandum also admits that Plaintiff's father was advised during his December 13, 1999 interview that he could come to the United States, but that he "indicated that he was uninterested" in applying for a visa to do so. *Id.* Clearly then, Plaintiff's father must not have been interested in asserting his parental authority, or he would have expressed a desire to come to the United States at that time. The fact that he did not wish to come to the United States when given the opportunity to do so freely, demonstrates the likelihood that he is now being coerced by Castro's Communist regime, as part of the apparent deal with the Administration, and, like Plaintiff, is being used as a pawn in the relations between the two countries. Accordingly, the decision not to grant Plaintiff an asylum hearing could not have been reached on the merits.

-13-

alleged, but, rather, tried to rationalize an agency decision -- after-the-fact -- that conflicted dramatically with existing policy. The policy that the INS applies to every minor except Plaintiff is disclosed in a number of the recently obtained documents:

> When deciding whether to permit the minor to withdraw his or her application for admission, [INS] officers must also make every effort to determine whether the minor has a fear of persecution or return to his or her country. **If the minor indicates a fear of persecution or intention to apply for asylum, or if there is any doubt, especially in the case of countries with known human rights abuses or where turmoil exists, the minor should be placed in removal proceedings . . . ."**

*See* Fitton Decl. at Exhibit 1, pg. 12 (emphasis added). Clearly, the U.S. Congress has repeatedly condemned Castro's Communist regime in forceful terms for its appalling police state practices, relentless suppression of democratic values and gross human rights abuses. *See, e.g.,* 22 U.S.C. § 6031(1), 22 U.S.C. § 6002(5), 22 U.S.C. § 6001(2), 22 U.S.C. § 6021(6) and 22 U.S.C. § 60-21(9). Given these new documents, the INS should have to explain to the Court why it deviated from this established policy of placing minors such as Plaintiff in a removal proceeding -- where a neutral, Administrative Law Judge would have adjudicated the matter -- but instead purportedly adopted a "new" policy where the old one would have sufficed.

Most troubling about this new evidence is that it also reveals a desire to cooperate with and appease Castro's Communist regime rather than preserving Plaintiff's rights. This is in direct contravention of well-settled law that "factors such as the government's geopolitical and foreign policy interest [are] not legitimate concerns of asylum." *Doherty v. Immigration Naturalization Service*, 908 F.2d 1108, 1119 (2d Cir. 1990), *rev'd on other grounds*, 502 U.S. 314 (1992). It is apparent that, from the start, the Administration had cut an apparent deal with the Cuban government for the return of Plaintiff, and, thus, the INS was working with the Cuban government to achieve this

end.  Again, the December 11, 1999 talking points demonstrates the INS' desire to appease Fidel

Castro's Communist regime:

> **We understand your frustration that we cannot assure the immediate return of
> the minor Elian Gonzalez.  We, too, are committed to resolving this situation as
> quickly as possible** in order to avoid further hardship to the boy . . . **The father is
> the best person to express his own wishes on behalf of the child,** and those wishes
> will be more credible and persuasive if they come directly from him.

*See* Fitton Decl. at Exhibit 1, pg. 68-69 (emphasis added).  The signal being sent to Castro's

Communist regime is clear -- the INS "too" wishes to "resolve" the controversy surrounding Elian

by returning him to Cuba as quickly as possible.  Given this clear demonstration of the INS'

intentions, Plaintiffs' efforts to obtain an asylum hearing were doomed from the start -- Elian would

be returning to Communist Cuba.

Moreover, an INS e-mail demonstrates the on-going and frequent nature of the government's

interaction with Castro's Cuba, consistent with an apparent deal to work together to achieve

Plaintiff's return:

> **The DOS [Department of State] wants to have a daily conference call to
> coordinate press guidance and communications with the Cubans.** They have lots
> of questions concerning the timing of litigation, so they have asked the OIL [INS'
> Office of Immigration Litigation] to participate.  The calls will be at 9:00 a.m. . . .

*See* Fitton Decl. at Exhibit 1, pg. 3.  Undated, handwritten notes -- on the letterhead of the INS'

Office of District Director in Miami, Florida -- state: **"Show Fidel -- we gave back child . . . but**

**not giving up Cuban Adjustment.  Not opposing adjustment . . . But concern about magnet**

**effect."** *See* Fitton Decl. at Exhibit 1, pg. 6 (emphasis added).  The notes obviously demonstrate the

INS' desire to appease Castro by returning Plaintiff to Cuba while maintaining the INS' position on

the Cuban Adjustment Act in the face of a concern about a magnet effect, *i.e.*, an influx of refugees

-15-

fleeing Communist Cuba. Clearly, the INS treated Plaintiff as nothing more than a pawn in United States' relations with Castro's Communist regime -- in complete derogation of his rights.

Similarly, a January 6, 2000 e-mail show an INS official complaining about the appearance created by a *The New York Times* article, in which senior administration officials acknowledged the role played by U.S.-Cuban relations in the INS' decision to return Plaintiff to Castro:

> Have you seen the New York Times Article today. It says that senior administration officials acknowledged that the decision was made with full awareness that a contrary decision would worsen US relations with Cuba. Should you bring this up on this conference call?

*See* Fitton Decl. at Exhibit 1, pg. 7. In a reply e-mail, another INS official expressed concern about being "in a position to control the message," which clearly reflects an intent to avoid acknowledging the truth about the INS' emphasis on dealing with and placating Castro's Communist regime. *Id.* The referenced article and e-mail messages thus contradict representations made by the INS to this Court that its decision to return Plaintiff to Cuba resulted from lawful agency decision-making rather than concerns about placating a Communist dictator.

As a result of its single-minded focus on appeasing Castro, the INS conjured up a bogus, *ex post facto* policy that was in conflict with congressional intent as expressed in the asylum statute, existing INS policies and practices, and, most importantly, was contrary to the best interests of this six-year-old boy, who with his now-deceased mother had just risked their lives fleeing from a totalitarian, Communist police state. Clearly, based on this documentation, Plaintiff's asylum application was "dead on arrival" at the INS. This simply is not -- and cannot be -- the basis for lawful agency decision-making.

In this context, it is appropriate to note that, while this motion and the many other pleadings and orders filed in this case speak of the INS "decision" regarding Plaintiff's asylum application, the one thing that is conspicuously absent from these documents is any evidence that a "decision" -- meaning a weighing of competing factors based upon a thorough and unbiased factual and legal analysis -- was ever made. To the contrary, the documents demonstrate that no "decision" was made, because the outcome was pre-determined by an apparent deal between the Clinton Administration and Castro: Elian was to be returned to Cuba.

However, the Court did not have the benefit of **any** of these newly discovered documents when it made its ruling of March 19, 2000. At best, the newly discovered documents are evidence that may have changed this Court's decision. At worst, they are evidence of the INS' dishonesty with this Court. Either way, this new evidence mandates the relief sought herein.

## II.   Discussion.

### A.   This Court Has Jurisdiction to Consider Plaintiff's Rule 60(b) Motion.

It is well settled that a pending appeal does not preclude a district court from entertaining a Rule 60(b) motion:

> A litigant may file a Rule 60(b) motion in the district court despite a pending appeal; the district court may entertain the motion; it may deny the motion on the merits and if the district court is inclined to grant the motion, the district court or the movant may inform the court of appeals. The appellate court may then remand the matter to the district court for the purpose of granting the motion. Virtually all of the circuits now accept this as the proper procedure for dealing with Rule 60(b) motions while an appeal is pending. Only the Ninth Circuit follows a different rule of procedure.

12 J. Moore, *Moore's Federal Practice*, § 60.679[2][b]. (Matthew Bender 3d ed. 1999). This is the law in the Eleventh Circuit. *See, e.g., Parks v. U.S. Life and Credit Corp.*, 677 F.2d 838, 840 (11th

Cir. 1982); *Lairsey v. Advanced Abrasives Co.*, 542 F.2d 928, 932 (5th Cir. 1976).  Indeed, as the

U.S. Supreme Court recently held:

> . . . the pendency of the [Rule 60(b)] motion before the district court does not affect
> the continuity of a prior-taken appeal.  And last but not least, the pendency of an
> appeal dose not affect the district court's power to grant Rule 60 relief.  A litigant
> faced with an unfavorable district court judgment must appeal that judgment within
> the time allotted by Federal Rule of Appellate Procedure 4, whether or not the litigant
> files a Rule 60(b) motion . . . Either before or after filing his appeal, the litigant may
> also file a Rule 60(b) motion for relief with the district court.  The denial of the
> motion is appealable as a separate final order, and if the original appeal is still pending
> it would seem that the court of appeals can consolidate the proceedings.

*Stone v. Immigration and Naturalization Service*, 514 U.S. 386, 401 (1995) (citations omitted).

Clearly, this Court has jurisdiction to consider Plaintiff's Rule 60(b) motion.  *See also Standard Oil*

*Co. of California v. United States*, 429 U.S. 17, 18-19 (1976).

**B.    Standards Governing Rule 60(b) Motions.**

Rule 60(b) of the Federal Rules of Civil Procedure provides, in pertinent part, that

a district court may, "upon such terms as are just," relieve a party from a final judgment or order.

The reasons for granting relief include "newly discovered evidence which could not be discovered in

time to move for a new trial under Rule 59(b)," "fraud . . . misrepresentation, or other misconduct

of an adverse party," and, "any other reason justifying relief from the operation of the judgment."

Fed.R.Civ.P. 60(b)(2), (3) and (6).

In the Eleventh Circuit, "to prove a basis for relief under this rule, a party must demonstrate

that (1) the evidence is newly discovered since the judgment was entered; (2) due diligence on the

part of the movant to discover the new evidence has been exercised; (3) the evidence is not merely

cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that is likely to

produce a new outcome if the case were re-tried, or is such that would require the judgment to be

amended." *Taylor v. Texgas Corp.*, 831 F. 2d 255, 259 (11th Cir. 1987); *see also* 11 C. Wright and

A. Miller, *Federal Practice and Procedure: Civil*, §2859 at 182-185 (2d ed. 1973) ("Wright &

Miller").

In order to obtain relief under Fed. R. Civ. P. 60(b)(3), "the moving party must establish that

a judgment was obtained by fraud, misrepresentation, or misconduct, and that the conduct

complained of prevented the moving party from fully and fairly presenting his case." The rule is

aimed at judgments which were unfairly obtained, and not even necessarily those which are factually

incorrect. *In Re M/V Peacock on Complaint of Edwards*, 809 F. 2d 1403, 1405 (9th Cir. 1987). As

the U.S. Court of Appeals for the Fifth Circuit held in *Rozier v. Ford Motor Co.*, 573 F. 2d 1332,

1339 (5th Cir. 1978), which articulates the following standard:

> One who asserts that an adverse party has obtained a verdict through fraud,
> misrepresentation or other misconduct has the burden of proving the assertion by
> clear and convincing evidence. The conduct complained of must be such as prevented
> the losing party from fully and fairly presenting his case or defense. Although Rule
> 60(b)(3) applies to misconduct in withholding information called for by discovery, it
> does not require that the information withheld be of such nature as to alter the result
> in the case. This subsection of the Rule is aimed at judgments which were unfairly
> obtained, not those which are factually incorrect.

*Rozier*, 573 F.2d at 1339 (citations omitted).

The "catch-all" provision of Rule 60(b)(6) gives the district court the power to vacate

judgments whenever such action is appropriate to accomplish justice, such as where a judgment is

obtained by improper conduct or excusable default by the party against whom it is directed. *See*

Wright & Miller, § 2864 at 211-212. The court should consider whether granting relief would further

the ends of justice without prejudicing the substantial rights of the parties. *Id.* at 213.

-19-

At a minimum, in the instant case: (1) the documents at issue were withheld by the INS until well after this Court rendered its March 19, 2000 decision; (2) due diligence was exercised by Plaintiff in that the documents were requested in discovery, but were never produced; (3) the evidence is not cumulative or merely impeaching, but, rather, refutes *in toto* the INS' claims about the "decision-making" process it followed in this instance; (4) the evidence presented by the newly discovered documents is material to Plaintiff's claims insofar as it goes to the very core of the INS' purported "decision-making" process; and (5) the evidence certainly would produce a new outcome as it completely undercuts any basis for the deference that this Court previously afforded to the INS. Accordingly, Plaintiff should be afforded relief from the Court's March 19, 2000 order pursuant to Fed.R.Civ.P. 60(b)(2). Plaintiff also respectfully submits that this same newly discovered evidence presents a clear and convincing case that a fraud has been worked upon both Plaintiff and the Court such that relief is also warranted under Fed.R.Civ.P. 60(b)(3).

**D.     This Court is Not Bound by the *Post Hoc* Rationalization Evidenced by Plaintiff's Newly Discovered Evidence.**

Clearly, Plaintiff has demonstrated compelling grounds for this Court to reopen this matter. Despite Plaintiff's due diligence efforts to obtain evidence such as the newly discovered items set forth above during the course of discovery, the INS refused to produce it, and the representations it made to the Court and to the American people are directly at odds with this evidence. Moreover, this compelling, newly discovered evidence is material, and clearly would have led to a different result if it had been made known to Plaintiff and the Court prior to the Court's March 19, 2000 decision.

While agencies may be best equipped to investigate relevant facts, analyze complex issues, and assess competing interests, the hallmarks of proper agency action are thoroughness of

-20-

investigation and consideration, not preconception or predisposition toward a given result, and objective decisionmaking. It is these characteristics that underlie judicial deference to agency action in making decisions and adopting and applying policies. *See, e.g., Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

But this process consistently fails where an agency makes a decision prior to adopting a policy, then adopts a policy to rationalize the pre-existing decision. For this reason, the U.S. Supreme Court adopted a bright-line rule that, in such situations, the after-the-fact policy is entitled to no deference, as the very reason for according deference -- the agency's expertise and ability to take its time and do a thorough job -- are missing:

> **"The court's may not accept appellate counsel's *post hoc* rationalizations for agency action** . . . For the courts to substitute their or counsel's discretion for that of the [agency] is incompatible with the orderly functioning of the process of judicial review." . . . Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands. It is the administrative official and not appellate counsel who possesses the expertise that can enlighten and rationalize the search for the meaning and intent of Congress. . . . **If [an agency] faces such questions [about its lawful authority] only after [it] has acted, there is substantial danger that the momentum generated by initial approval may seriously impair the enforcement of the . . . laws that Congress enacted.**

*Investment Co. Institute v. Camp*, 401 U.S. 617, 628 (1971), *quoting, Burlington Truck Lines v. United States*, 371 U.S. 156, 168-69 (1962) (emphasis added). At best, Plaintiff's newly discovered evidence demonstrates that this is precisely what occurred here: with or without a deal between the Administration and Castro's Communist regime, the INS first decided to return Plaintiff to Castro's Communist regime, then the "momentum" generated by its initial decision dictated the end result, regardless of Plaintiff's rights, and impaired the proper application the asylum laws enacted by Congress.

-21-

The Eleventh Circuit also applies this bright-line test. At issue in *William Bros., Inc. v. Pate*, 833 F.2d 261 (11th Cir.1987) was whether a coal miner who worked above-ground could receive black lung benefits for exposure to "coal mine dust" The Secretary of Labor, who administered the Black Lung Benefits Act (the "Act"), had not adopted a regulation defining "coal mine dust." During the prosecution of Pate's application, he advanced the novel position that "coal mine dust" included all dust from a coal mine site regardless of whether it was above-ground or below-ground. The Eleventh Circuit found that "[b]efore addressing the proper meaning of 'coal mine dust,' we must first address the issue of whether this court should give deference to any administrative entity which has interpreted the term." *Williams Bros., Inc.*, 833 F.2d at 264. In analyzing this issue, the Court made a distinction between a position taken in a given case and a position adopted in formal regulations, then held that only the latter is entitled to deference:

> [T]he director argues that the Secretary's views are entitled to deference from this court. While it is obviously true that deference would be due any implementing regulations promulgated by the Secretary, we see no expression of policy by the Secretary in this case to which deference would be appropriate. In response, the Director urges us to find that the position which he has taken in this appeal, *i.e.*, that "coal mine dust" is synonymous with "any dust," constitutes such an expression of policy since it represents the Secretary's views.
>
> . . . This court is not bound to defer to the Director's view in this case. If the Secretary has a position he wishes to express, he can do it through the proper forum, i.e., the implementation of new, clarifying regulations. Thus, we find without merit the Director's argument that his novel position is entitled to deference.

*Williams Bros., Inc.*, 833 F.2d at 265. The Eleventh Circuit then highlighted the effect of its dismissing the Secretary's *post hoc* rationalization by stating that "[h]aving concluded that there is no administrative interpretation of "coal mine dust" to which we can appropriately defer, we are left to a plenary review of the issue." *Williams Bros., Inc.*, 833 F.2d at 265.

Clearly, like the Court in *Williams Bros., Inc.*, this Court is not bound by *post hoc* agency rationalizations such as that evidenced by Plaintiff's newly discovered evidence. *Williams Bros., Inc.*, 833 F.2d at 265; *see also*, *Bradberry v. Director, Office of Workers' Comp. Programs*, 117 F.3d 1361, 1366 (11th Cir. 1997); *McKee v. Sullivan*, 903 F.2d 1436, 1438 n. 3 (11th Cir.1990). The newly discovered documentary evidence shows that, like the Secretary of Labor in *Williams Bros., Inc.*, the Commissioner of the INS adopted an after-the-fact rationalization in this case, with an eye towards litigation, not legitimate agency decision-making. This documentary evidence also demonstrate that the Clinton Administration and the Immigration and Naturalization Service acted in concert with Cuba, that the United States had agreed with Castro's Communist regime from the outset that Elian Gonzalez would be returned as requested, that the INS' actions have been driven from the date of that early agreement by a need to justify (rationalize) the action that it had to take -- the return Elian at any cost, including overriding specific congressional action to keep Plaintiff in the United States. *See*, *e.g.*, Fitton Decl. at Exhibit 1, pg. 17 and 19.

Finally, it is also significant that, after discovering this new documentary evidence, Plaintiff's counsel gave notice to Attorney General Reno and INS Commissioner Meissner of the numerous irregularities, clear evidence of illicit cooperation with a totalitarian, Communist regime, and conflicts of interest regarding the government's decision-making process in this case. *See* Fitton Decl. at para. 6 and Exhibit 2. In a letter to Attorney General Janet Reno and INS Commission Meissner, Plaintiffs' counsel puts the government on notice that strong evidence exists indicating that political considerations played a significant, if not determinative, role in the decision-making process of both federal agencies regarding this case. *Id.* Given that such assertions, if true, would constitute illicit and improper influence on the government's actions, surely at least one of these agency heads would have responded. Yet, they utterly

failed to object or even respond, raising a strong evidentiary presumption that misconduct occurred, through an apparent deal with Castro's Communist regime.

Given the great public attention this case has garnered, it is inconceivable that the government would have remained silent had these assertions been false. As is well-established, silence in the face of assertion that normally would be denied if acquiescence is not intended, may be received as an admission. *See, e.g., Megarry Bros., Inc. v. United States*, 404 F.2d 479 (8th Cir. 1968); *Hellenic Lines, Ltd. v. Gulf Oil Corp.*, 340 F.2d 398 (2d Cir. 1965); *Boerner v. United States*, 117 F.2d 387 (2d Cir. 1941); 4 Wigmore, *Evidence*, § 1073 (Chadbourn rev. 1972). This failure to respond thus provides further evidence of the INS' improper motivation and lack of good faith refusing to consider Plaintiff's asylum application.

### E.   A Temporary Restraining Order and/or Preliminary Injunction Is Necessary to Preserve the Status Quo.

The District Court may grant a temporary restraining order in its discretion. *See U.S. v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983). A temporary restraining order does not grant relief to the moving party, but merely preserves the status quo *ante*. *See Fernandez-Roque v. Smith*, 671 F.2d 426, 429 (11th Cir. 1982). There are four (4) standards the District Court considers in granting a temporary restraining order:

> (1) a substantial likelihood that the movants will ultimately prevail on the merits; (2) that they will suffer irreparable injury if the injunction is not issued; (3) that the threatened injury to the movants outweighs the potential harm to the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest.

*Hatian Refugee Center, Inc. v. Nelson*, 872 F.2d 1555, 1561 (11th Cir. 1989), *aff'd sub nom, McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991), *citing, U.S. v. Alabama*, 791 F.2d 1450, 1459 n.10 (11th Cir. 1986), *cert. den.*, 479 U.S. 1085 (1987); *see also Organized Fisherman of Florida v. Andrus*, 488

-24-

F. Supp. 1351, 1353 (S.D. Fla. 1980), *citing, Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

### 1.   Plaintiff Will Likely Prevail on the Merits.

Substantial reasons have been set forth in this motion demonstrating that relief from judgment is proper. Therefore, there is a substantial likelihood that Plaintiff's Rule 60(b) motion will succeed on the merits. The documentary evidence produced to Judicial Watch well after the Court's March 19, 2000 decision plainly demonstrate that the decision to reject Plaintiff's asylum application was based on an early agreement with Castro's Communist regime that Plaintiff would be returned to Cuba, rather than being based on the facts and the law. *See, e.g., Doherty*, 908 F.2d at 1119. Also, the Supreme Court has ruled that after-the-fact policy making is entitled to no deference, because the very reason for giving deference to an agency -- the agency's purported expertise in matters under its jurisdiction -- is missing. *See Investment Co. Institute*, 401 U.S. at 627-28; *William Bros., Inc.*, 833 F.2d at 265). Accordingly, the INS' actions are entitled to no deference and Plaintiff's Rule 60(b) motion therefore is likely to succeed.

### 2.   Plaintiff Will Suffer Irreparable Injury.

There is no question but that if this Court declines to grant a temporary restraining order, then Plaintiff will suffer irreparable harm. For if a restraining order does not issue in this case, then at four o'clock p.m. eastern time on Wednesday, June 28, 2000, Plaintiff Elian Gonzalez, a six-year-old boy, will lose all the freedoms and protections afforded him by the United States. At that time, he will be repatriated to Communist Cuba, with or without his consent.

Most importantly, if Plaintiff leaves American soil, then he will lose his right to seek asylum in this country. He will forever be denied his day in an American court to seek the protections of "this land of

freedom." *See Bridges v. Wixon* 326, U.S. 135, 154 (1945) (removing an alien "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom"); *Certain Named and Unnamed Non-Citizen Children and Their Parents v. Texas*, 448 U.S. 1327, 1332 (1980) (irreparable harm for alien children to be denied the mere right to a public school education); *Michael v. INS*, 48 F.3d 657, 664 (2d Cir. 1995) ("Absent a stay, Michael would suffer irreparable injury through deportation, thereby mooting his case.").

### 3. The Threatened Harm to Plaintiff Outweighs Harm to Defendants.

For the reasons set forth above, the threatened harm to Plaintiff in this case is great and irreparable. By contrast, it is difficult to conjecture what harm, if any, that would result from a temporary restraining order.

The United States has no interest whatever in whether this temporary restraining order is granted. It is frankly impossible to fathom how a temporary restraining order preventing a six-year-old boy from leaving the country could affect a national interest. Indeed, if the United States truly had an interest in Plaintiff's fate, then the INS would have properly adhered to its policy regarding minor aliens, and would have placed Plaintiff in a removal proceeding before an Administrative Law Judge and would not have changed its policy in order to short-circuit Plaintiff's due process protections. That the INS would seek to prevent a neutral Administrative Law Judge from determining the best interests of Plaintiff strongly suggests that the United States has no interest in his well being.

Additionally, Plaintiff's father will not suffer any undue burden from the temporary restraining order. He, his wife and their child currently are living with Plaintiff in a luxurious estate in the United States, free of any cost to them, and is not deprived of Plaintiff's love or companionship in any way. A

temporary restraining order, moreover, in no way affects Plaintiff's father's right and power to return to Cuba at any time of his own choosing. In any event, any harm visited upon Plaintiff's father from the granting of a temporary restraining order is greatly outweighed by the real and irreparable harm that Plaintiff will suffer if this temporary restraining order does not issue.

### 4. The Temporary Restraining Order Does Not Offend Public Interest.

There simply is no cognizable public interest in the denial of the temporary restraining order. It is frankly impossible to see how a **temporary** order preventing a six-year-old boy's repatriation to Communist Cuba would offend the public interest of the United States. As set out immediately above, the public has no interest in Plaintiff's fate, and therefore, a temporary restraining order cannot offend a nonexistent interest. "[C]ongress has made it clear that factors such as the government's geopolitical and foreign policy interest [are] not legitimate concerns of asylum." *Doherty*, 980 F.2d at 1119. Ironically, it is the granting of a temporary restraining order which would most uphold the public interests of the United States -- the ethic that all who are in need may seek justice before the federal courts, and that the United States shall do all within its power to protect a child from persecution.

## IV. Conclusion.

The INS, the Clinton Administration, and Castro's Communist Regime are playing politics with the future of this six-year old boy. This Court, for the first time, has access to documentary evidence demonstrating that, thanks to an apparent deal with Castro's Communist regime, the INS and the Clinton Administration determined from the outset to send Plaintiff back to Cuba without regard for the facts, the law or Plaintiff's rights. That pre-determined decision simply is not entitled to any deference. Accordingly, the Court should reopen its March 19, 2000 decision and allow Plaintiff to develop a full and complete

-27-

record through discovery, including the deposition of relevant officials.  In addition, the Court should also

grant a temporary restraining order and/or preliminary injunction enjoining Plaintiff's removal from the

United States until such time as a full, complete and **accurate** record has been developed and the Court

has had the opportunity to consider the true facts behind what has occurred in this extraordinary case.

Respectfully submitted,

JUDICIAL WATCH, INC.

Larry Klayman, Esq.
Fla. Bar No. 0246220

Paul J. Orfanedes, Esq.
(Not a Member of the Florida Bar)
501 School Street, S.W., Suite 725
Washington, DC 20024
Tel.:    (202) 646-5172
Fax.:    (202) 646-5199

Kendall Coffey, Esq.
Fla. Bar No. 259861
COFFEY, DIAS & O'NAGHTEN, L.L.P.
Suite 200 Grand Bay Plaza
2665 South Bayshore Drive
Miami, FL 33133
Tel.:    (305) 285-0800
Fax.:    (305) 285-0257

Linda Osberg-Braun, Esq.
Fla. Bar No. 0827282
Roger A. Bernstein, Esq.
Fla. Bar No. 0968714
HACKLEY, BERNSTEIN & OSBERG-BRAUN
2875 N.E. 191st Street, Penthouse 1B
Aventura, Florida 33180
Tel.:    (305) 692-8888
Fax.:   (305) 692-8838

Barbara Lagoa, Esq.
Fla. Bar No. 966990
Judd J. Goldberg, Esq.
Fla. Bar No. 0115924
Eliot Pedrosa, Esq.
Fla. Bar No. 0182443
GREENBERG TRAURIG
1221 Brickell Avenue
Miami, Florida 33131
Tel.:    (305) 579-0500
Fax.:   (305) 579-0717

Spencer Eig, Esq.
Fla. Bar No. 0162681
LAW OFFICES OF SPENCER EIG
420 Lincoln Road, Suite 379
Miami Beach, Florida 33139
Tel.:    (305) 672-2770
Fax.:   (305) 672-3770

Jose Garcia-Pedrosa, Esq.
Fla. Bar No. 0137115
RUDEN, MCCLOSKY, SMITH,
 SCHUSTER & RUSSELL, P.A.
701 Brickell Avenue
Miami, FL 33131
Tel.:    (305) 789-2700
Fax.:   (305) 789-2793

Co-Attorneys for Elian Gonzalez
and Lazaro Gonzalez

## CERTIFICATE OF SERVICE

I certify that on June 27, 2000 by facsimile and June 28, 2000 by hand, a true and correct copies of the foregoing PLAINTIFF'S EMERGENCY MOTION FOR RELIEF FROM JUDGMENT AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION was served on the following:

> Dexter A. Lee, Esq.
> Assistant U.S. Attorney
> 99 N.E. 4th Street
> Miami, FL 33132
>
> David J. Kline, Esq.
> William J. Howard, Esq.
> U.S. DEPARTMENT OF JUSTICE
> Civil Division/Office of Immigration Litigation
> Room 7016
> 1331 National Place
> Washington, DC 20004
>
> Gregory B. Craig, Esq.
> WILLIAMS & CONNOLLY
> 725 Twelfth Street, N.W.
> Washington, D.C.  20005-5901

Paul J. Orfanedes